227 N.J. Super. 351 (1987)
547 A.2d 701
KATHLEEN BENGIS, PLAINTIFF-APPELLANT,
v.
RICHARD BENGIS, DEFENDANT-RESPONDENT, JAMES MCGETTIGAN, PLAINTIFF-RESPONDENT,
v.
KATHLEEN MCGETTIGAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted May 5, 1987.
Decided August 11, 1987.
*352 Before Judges ANTELL, LONG and D'ANNUNZIO.
Goldenberg, Mackler & Sayegh, P.A., attorneys for appellant (Mona R. Raskin, on the brief).
Alfred J. Bennington, Jr., attorney for respondent (William A. Bromley, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
On appeal in this post-judgment matrimonial action, plaintiff, Kathleen Bengis McGettigan challenges an order of the trial judge which held her former husband, defendant, Richard Bengis responsible for past and future child support for the children of their marriage and relieved James McGettigan (plaintiff's new husband) from any child support obligation.
Plaintiff and defendant were divorced in 1977. Plaintiff married James McGettigan in 1982. McGettigan filed a complaint to dissolve that marriage in November, 1985. Plaintiff filed an answer to the McGettigan complaint, asserting that McGettigan stood in loco parentis to her children and was *353 therefore equitably estopped from denying them support. She also filed a pendente lite motion for support and maintenance.
In February 1986 the trial judge entered a pendente lite order requiring McGettigan to pay various shelter expenses as well as the tuition and other fees for the children at parochial school. Plaintiff then moved to reopen her first divorce judgment seeking arrearages and child support which had accrued since the date of termination of child support, May 1982, and further seeking an increase in child support from defendant. Defendant submitted a certification in opposition alleging that he discontinued child support and terminated all of his parental rights in reliance on an agreement between the parties. These two matrimonial actions were consolidated and a plenary hearing was scheduled.
At the hearing, the following facts were elicited. Plaintiff was married to defendant in September, 1969. They separated in 1972 when their daughters, Francine and Antoinette, were two and three years old, respectively. Defendant joined the Marine Corps one day after the separation agreement was executed and did not appear at the divorce proceedings, which resulted in a judgment of divorce entered March 22, 1977. After the divorce, defendant consistently paid child support in the sum of $140 per month and visited the children at various times, although he had moved to Georgia after being discharged from the Marine Corps in January 1978.
Plaintiff began dating McGettigan in 1978 when the children were six and seven years old. From 1978 until 1982, when they married, plaintiff and the children would stay at McGettigan's apartment every weekend. They all vacationed together. Prior to his marriage to their mother, McGettigan spoke to both children and asked if they would like to be called "McGettigan." Both children responded affirmatively. One of the daughters, Francine, testified that a few months before the marriage McGettigan had told them that they were to be adopted and she and her sister approved.
*354 McGettigan testified that he had spoken to the children about a name change on a couple of occasions but that he had made no firm plans for adoption. He admitted that the children wanted to be called McGettigan and utilized his last name in several contexts, including religious confirmation and communion and enrollment in a beauty pageant.
Plaintiff and McGettigan were married in 1982. After the marriage the girls began calling McGettigan "dad" and referring to their natural father as "Richie." Francine testified that her friends in fifth grade called her "soon to be a McGettigan" and she signed her Santa Claus letter that way.
In May 1982 defendant was audited by the IRS because both he and the plaintiff were listing the children as exemptions on their federal income tax returns. Defendant called plaintiff and eventually spoke to McGettigan who discussed the tax exemptions as well as his desire to adopt the children and change their name. At first, defendant was totally against this but later decided that if that was what the children wanted, he would agree to it.
During the summer of 1982 defendant and his second wife, Susan, visited New Jersey and took the two girls to the beach while plaintiff and McGettigan were at work and were unaware of where the girls had gone. The ensuing phone conversation involved both natural parents, their spouses and the two children. Fifteen-year-old Francine described the incident in her testimony:
A. The only discussion I can recall was in the summer of '82 on the  after my father, Richie, had come to take us  he took us to the beach and nobody knew where we were that day. When we came back from the beach my sister and I both went upstairs to the apartment where we were living at, and my dad was really angry that Richie had come and taken us out. And he, one of the main things was he said, "I thought I was your father now," and he didn't think it was right for us to see Richie anymore. So he contacted Richie and asked him, well told him, that he  that we wanted to be adopted by him and that he wanted to adopt us. And Richie said well he wouldn't believe it until he heard it from me and my sister. So Jimmy and Richie and Susan were all on the phone, and one at a time me and my sister got on the phone and Richie asked us, Jimmy said, "Go ahead, tell him." And Richie said, "Do you want to be *355 adopted by Jimmy?" And I said, "Yes, I want to be adopted by him." And Richie said, "Are you sure that's what you want?" I said, "Yes, I'm sure." And Jimmy said, "There, are you satisfied?" And he heard it and they had all heard the same conversation. And my sister got on the phone and said yes to the same thing.
Plaintiff, defendant and his wife Susan all testified to the substance of that telephone conversation in which it was agreed that McGettigan would adopt the two girls and Bengis would pay the back taxes and be relieved of any further child support or contact with the children. McGettigan denied the conversation ever involved his agreement to adopt the girls, and claimed that it was confined to letting Bengis know that he was to call before he came over and picked up the girls.
After this conversation defendant returned to Georgia and saw an attorney at Legal Services. As a result of that meeting he sent a letter to McGettigan in which he agreed to pay the back taxes upon being relieved of child support obligations.
After the letter was sent to McGettigan, defendant received a telephone call from plaintiff and McGettigan, during which conversation it was understood that there would be no more child support paid and that defendant would take the responsibility for straightening out the IRS matter. Bengis testified that at that time he spoke again to his two daughters to make sure that "this is exactly what they want, and if there was any time or any changes as far as the adoption that they should contact  my two daughters should contact me. And this basically was the last conversation I ever had with Mr. McGettigan and my ex-wife or children." McGettigan testified that he could recall no conversation in which Susan Bengis or the children were placed on an extension of the telephone. Susan Bengis, on the other hand, testified that during the conversation McGettigan said that the amount of child support paid was not worth it, that he was planning to adopt the children anyway, "and that if we would just pick up the back sum on the audit, that he would take care of the kids and deal with the adoption and such." She further said that the girls stated that *356 they wanted the adoption, that it had been discussed between McGettigan and them and that they considered him a father.
After these phone conversations, Susan Bengis wrote up an agreement, she and defendant signed it and mailed it to the McGettigans. The agreement dealt with the back income taxes, the McGettigans' right to claim the children as exemptions, the discharge of the Bengis family from any child support obligation and their agreement not to exercise any visitation rights. It further set forth defendant's consent to the prospective adoption of his daughters by McGettigan. Both plaintiff and McGettigan signed the agreement, made a copy for themselves and sent either the copy or the original back to the Bengises.
Susan Bengis recalled receiving a copy of the agreement in the mail but could not locate it. Plaintiff put her copy into a private personal paper box and she testified that McGettigan emptied that box when he left the house in September 1985. McGettigan claimed that he never signed nor saw a document agreeing to adopt his stepchildren or to release defendant from his child support obligations. Furthermore, he claimed he never took any papers when he left the house. None of the parties produced the written agreement at trial.
Defendant discontinued child support payments in May 1982. Since the summer of 1982 and until the trial, Bengis never saw his daughters. He never spoke with them or communicated with them in any manner. His mother and his brother, who live in the Atlantic City area, also discontinued their relationship with the girls.
McGettigan testified that after his marriage his mother treated Francine and Antoinette as grandchildren and his sister and other relatives sponsored the children for various religious events. He admitted that he attended the "Miss Shore Mall Pageant" which Francine won and that she was sponsored by McGettigan's Saloon, a family enterprise. She further used the surname McGettigan during the pageant.
*357 The children were enrolled at Holy Spirit High School. Antoinette was at the end of her junior year in that high school at the time of trial. Plaintiff testified that the purchase of a new house, the cost of a large wedding and the heavy tuition payments at Holy Spirit High School made them decide to defer the adoption proceeding. The attorney who represented the McGettigans at the closing of their house testified that McGettigan inquired of him about adoption costs on two separate occasions. McGettigan admitted that he made the same inquiry of another attorney as well.
McGettigan's gross income in 1985 was $40,000 from his work as a policeman and in several parttime jobs. His case information statement indicated personal monthly expenses of $2000. Plaintiff's gross salary as a nurse is $440 per week ($22,880). She also earned an additional $170 bi-weekly from a second nursing job, or a total of $24,300. Her case information statement listed total monthly expenses for herself and the two girls of $3500. This figure includes private school tuition and charges.
Defendant is currently a fire inspector employed at a Marine base in Albany, Georgia, earning $17,300 a year. His gross bi-weekly salary is $657.60 and his net bi-weekly pay is $429.33. His wife is employed in the laboratory of a hospital in Georgia. After the agreement with McGettigan was reached, defendant and his wife purchased a new home for themselves and their two children and a third child was born to them.
The trial judge found that the parties had made an agreement and that the consent to adoption was contained in that agreement. He further found that McGettigan during the marriage, treated the children as his own, was warm and loving, and that his actions interfered with and caused a breach in the relationship between the natural father and the children. The judge further found that McGettigan made representations both before and after the marriage that he would adopt the children and take care of them and that these representations induced *358 defendant, plaintiff and the children to rely on him for the support which the natural father was no longer supplying. In reliance on the agreement, the judge found that defendant paid no further support, ended his relationship with his two children, purchased a new home and had another child.
The judge held that the requisites of equitable estoppel were met so as to require McGettigan to pay pendente lite child support but that this finding did not require McGettigan to pay support after his divorce from plaintiff. According to the judge, the financial detriment discussed in Miller v. Miller, 97 N.J. 154 (1984) is detriment caused by the inability to obtain support from the natural father. Since the support could be obtained from defendant, the judge ordered McGettigan's obligation to pay support to terminate upon the entry of the divorce judgment. He further set a figure of $60 per week in child support from defendant, an amount based on the child support guidelines, taking into consideration that defendant and his present wife are employed.
The judge also held that the contract between the parties was not binding because an agreement which would preclude children from seeking support from their natural father is against public policy. An order was entered accordingly and this appeal followed. We reverse.
In Miller v. Miller, supra, the Supreme Court addressed the question of the relative child support obligations of a formerly married couple and the wife's new husband in estoppel terms:
Today, we decide that in appropriate cases, a permanent support obligation may be imposed on a stepparent on the basis of equitable estoppel, but that this doctrine should be applied with caution. Voluntary support by a stepparent should not be discouraged. [at 167]
While pendente lite applications are entitled to some latitude to alleviate immediate hardship to the children caused by the breakup of a marriage in which a stepparent is the major source of support for the family, the court stated that the requirements for permanent support are more stringent:

*359 To be entitled to permanent child support, Gladys, as the party alleging equitable estoppel, has the burden to prove that Jay's conduct established the three prerequisites to equitable estoppel  representation, reliance, and detriment. We recognize that there can be many forms of misrepresentation. We do not agree with those courts that have held that for equitable estoppel to apply the children must believe that the stepparent is their natural parent. Such a requirement would unduly limit this cause of action to those cases in which the stepparent appeared on the scene when the children were infants. We do believe, however, that for equitable estoppel to apply the stepparent must have made some representation of support to either the children or the natural parent as to his or her responsibilities in his or her relationship with them. [Miller, supra, 97 N.J. at 167-168]
In the instant case, the trial judge found that plaintiff established the first two prerequisites  representation and reliance. These findings are adequately supported by the record. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-484 (1974). However, the trial judge found that the further requirement of financial detriment was not met. That requirement was discussed in Miller:
To prove equitable estoppel, the custodial parent has the burden to establish not only representation of support and reliance but also detriment, i.e., that the children will suffer future financial detriment as a result of the stepparent's representation or conduct that caused the children to be cut off from their natural parent's financial support. Matrimonial cases are extremely fact-sensitive because each case involves a unique set of interpersonal relationships. The burden of establishing economic detriment depends on the facts of the particular case. [Id. at 168-169]
The Supreme Court illustrated the concept of detriment:
For example, at the final hearing if the custodial parent demonstrates that he or she (1) does not know the whereabouts of the natural parent; (2) cannot locate the other natural parent; or (3) cannot secure jurisdiction over the natural parent for valid legal reasons, and that the natural parent's unavailability is due to the actions of the stepparent, a trial court could hold that the stepparent is equitably estopped from denying his or her duty to support the children. [Miller, supra, 95 N.J. at 169]
The trial judge apparently read this language as establishing the exclusive basis for a showing of "detriment." Thus he found, without further inquiry, that because defendant was amenable to the exercise of the court's jurisdiction, plaintiff could not show detriment to the children. We disagree with this analysis. In our view, when the Supreme Court gave an example of detriment, it was just that, an illustration and not a *360 limitation on the possible factors which could be implicated in such a case. To be sure, inability to locate or secure jurisdiction over the natural parent would constitute a clear case of detriment. However, we think that the question of future financial detriment is not so easy and that it may involve much more difficult and subtle issues than the mere inability of a plaintiff to haul a defendant into court.
Once having obtained jurisdiction over a natural parent, the full financial picture of all parties must be scrutinized. Included in this scrutiny should be the actual needs of the children, the ability of both the natural parents and the stepparent to meet those needs and any financial change in the status of the parties which may be said to have come about as a result of reliance on the stepparent's misrepresentations. For example, if a well-to-do stepparent promised future support to children of his or her spouses' prior marriage and, in reliance thereon, the children undertook a costly program of higher education which would have been out of the question in the absence of the stepparent's representations, financial detriment might be successfully claimed. Similarly, if a natural parent, relieved of his child support obligations because of the promise of a stepparent, gave up a lucrative profession or undertook new and financially burdensome responsibilities, his ability to support the children might well be considered to have been compromised to their detriment. What is important is that there is a broad spectrum of possibilities as far as financial detriment is concerned and that the resolution of this issue may well be a complicated, fact intensive one.
That is what is involved here. Unfortunately, the trial judge made no financial findings in this case. Indeed, the actual needs of the children were not even separately set forth in plaintiff's case information statement. Moreover, the debts and liabilities of defendant and his responsibility for the support of others undertaken subsequent to McGettigan's representation was not addressed despite the fact that the initial inquiry must be whether or not he is able to make the necessary *361 financial contribution. In addition, there is no explanation as to how the amount of $60 per week was reached other than that it was derived from the child support guideline tables, based on defendant's gross income of $17,300 per year. Without further information as to the economic circumstances of defendant and his ability to contribute to the legitimate future needs of the children, there is no method by which the award could have been meaningfully determined or reviewed. We thus reverse and remand the matter to the trial judge for a complete analysis of the financial issues in the case and for a determination as to whether the Bengis' daughters have and will suffer financial detriment as a result of the family's reliance on McGettigan's misrepresentations.
Plaintiff also claims that separate and apart from the issue of equitable estoppel, McGettigan should be held to a continuing obligation to support the Bengis' daughters because the trial judge found that there was an agreement between the parties to that effect. The trial judge found the contract to be unenforceable as contrary to public policy, but we perceive no basis for that conclusion. Certainly, an interspousal agreement relieving one of the parties of a child support obligation is injurious to the interests of the public if it leads to reliance on public assistance. Bergen County Welfare Bd. v. Cueman, 164 N.J. Super. 401, 404 (J. & D.R.Ct. 1978) (public agency sought reimbursement of financial assistance paid after mother entered into an agreement with the father of the child to relieve him of all further child support in consideration of a $500 lump payment). But an agreement providing for child support does not violate public policy if the party assuming responsibility voluntarily consents to the arrangement and is fully capable of discharging the duty. While the natural parents cannot simply bargain away their child's right to adequate support (Kopak v. Polzer, 4 N.J. 327, 333 (1950); ESB, Inc. v. Fischer, 185 N.J. Super. 373, 378 (Ch.Div. 1982)), nothing prevents a natural parent from assigning that duty to a financially responsible consenting third party. See Spellens v. Spellens, 49 Cal.2d *362 210, 317 P.2d 613 (1957) where the California Supreme Court held that such an agreement is specifically enforceable and in conformity with public policy.
Thus, not every agreement which makes provision for a child's future welfare will be held to violate public policy simply because one of the natural parents is relieved of that duty. Clearly, where the welfare of children is concerned, the court has discretion, reasonably exercised, to reject such an agreement. See Wist v. Wist, 101 N.J. 509, 512-513 (1986). That is what the trial judge purported to do here. But he did so on the faulty premise that every agreement for support by a third party is per se contrary to public policy. What he neglected to do was to analyze the facts of this particular contract and to explain how these facts came into conflict with applicable considerations of sound public policy. He merely found that an agreement existed but did not elaborate. On this remand, the trial judge should determine the nature of the agreement; what consideration was agreed upon; whether it imposed a duty on McGettigan which was intended to survive the dissolution of his marriage to plaintiff, and articulate why it does not warrant judicial enforcement.
Reversed and remanded; jurisdiction is retained. The judge is to file his findings and conclusions within thirty days.