255 N.J. Super. 185 (1990)
604 A.2d 695
J.W.P., PLAINTIFF,
v.
W.W. & J.H.P., DEFENDANTS[1].
Superior Court of New Jersey, Chancery Division Family Part, Morris County.
Decided November 6, 1990.
*186 Bonnie C. Frost, Attorney for the Plaintiff.
Richard Diamond, Attorney for the Defendant W.W.
Carol W. McCracken, Attorney for the Defendant J.H.P.
MARIANNE ESPINOSA MURPHY, J.S.C.
In Miller v. Miller, 97 N.J. 154, 478 A.2d 351 (1984) the Supreme Court held that in appropriate cases, a permanent support obligation may be imposed on a stepparent on the basis of equitable estoppel. The question raised by this case is whether a biological father who has provided no support for a child may avail himself of this doctrine to terminate his support obligation.
J.W.P. brought this paternity action against W.W. on November 1, 1989, approximately 16 months after the birth of her son Z.J.P. The Plaintiff's husband, J.H.P., was joined in this action upon the motion of Defendant, W.W. In addition to denying *187 paternity, W.W. asserts that the paternity claim should be barred for a variety of equitable reasons.
J.W.P. and J.H.P. were married on February 24, 1985. Approximately six months later, their son, W.J.P., was born. In March 1987, J.W.P. and J.H.P. attended a St. Patrick's Day party where J.W.P. met W.W., a former schoolmate of J.H.P.'s, and his wife. The two couples became quite friendly, seeing each other frequently. Both J.W.P. and W.W. testified that they became intimate and separated from their respective spouses in late August, just five months after their initial meeting.
In September, W.W. and J.W.P. rented a house, opened a joint bank account and discussed obtaining divorces so they could marry. They agreed to attend to W.W.'s divorce first. J.W.P. accompanied W.W. to an attorney's office where this topic was discussed and a $650 retainer paid with a check from their joint checking account.
J.W.P. testified that W.W. repeatedly expressed a desire to have a child with her and knowingly approved of her failure to use contraception. Since she had not ovulated in ten months, it was necessary for her to receive progesterone injections and take Provera. Pregnancy tests administered in August and in September proved to be negative. During the course of a physical examination in late October or early November, her physician advised her that she was pregnant. This conclusion was confirmed by a blood test on November 6, 1987.
Although J.W.P. and W.W. did not live together continuously during this period (September to November 1987), J.W.P. stated that they continued to have sexual relations and that she did not have sexual relations with her husband during this time. W.W. denies that he had sexual relations with J.W.P. after September 1987. In late November 1987, J.W.P. returned to the residence she shared with her husband. Although he knew she was pregnant, J.H.P. was still interested in preserving their marriage. J.W.P. stated that she continued her relationship *188 with W.W. until February 1988, deciding at that time to work on her marriage. Despite his earlier promises to provide for their child, W.W. would not return her calls when the baby was born in July 1988.
J.W.P. listed her husband as the child's father for the birth certificate and the child has used his surname since birth. She testified that, at W.W.'s request, visitation was arranged on several occasions from February to May 1989. Although he expressed an interest in resuming a relationship with her, W.W. indicated he did not want to provide support for Z.J.P.
In May 1989, J.W.P. wrote to W.W., asking him to choose either of two alternatives: give up his rights to Z.J.P. so that her husband could adopt him or work out an agreement regarding visitation and support. At this time, W.W. stopped visiting her and the child. Although he told her several times that he would relinquish his rights to Z.J.P., he never did so.
There was no evidence that J.H.P. took any steps to seek to adopt Z.J.P. The attorney who corresponded with W.W.'s counsel in this regard testified that she represented J.W.P. and never met with J.H.P. Both J.W.P. and J.H.P. testified that she undertook this effort without his knowledge and that, once he learned of her attempt in October 1989, he declined to adopt Z.J.P. The paternity complaint was filed shortly thereafter.
N.J.S.A. 9:17-43 establishes a presumption that a man is the natural father of a child if the child is born during his marriage to the child's natural mother. W.W. invokes this presumption to argue that J.H.P. is the father of Z.J.P. The presumption may be rebutted, however, by "clear and convincing evidence."
The fact of biological paternity cannot seriously be disputed in this case. The results of Human Leucocyte Antigen (HLA) blood tests and expert testimony admitted into evidence showed that it was "genetically impossible" for J.H.P. to be the natural father of Z.J.P. and that there was a 99.97% likelihood *189 that W.W. was the child's biological father. These results are entirely consistent with J.W.P.'s testimony. Under the circumstances, W.W.'s denial of sexual access, which was not credible, must be rejected. Therefore, I find that the evidence clearly and convincingly establishes that W.W. is Z.J.P.'s biological father. The child's birth certificate shall be amended pursuant to N.J.S.A. 9:17-59.
W.W. asserts that even if he is Z.J.P.'s natural father, J.H.P. should be "adjudicated" to be Z.J.P.'s father. He argues that it would offend public policy to permit a mother to "illegitimize" her child and further, that J.H.P. should be estopped from denying paternity.
The public policy issue is easily resolved. W.W. purportedly seeks to shield Z.J.P. from the "stigma" of illegitimacy. The practical consequences of recognizing W.W.'s paternity are no different from those which result from divorce and remarriage, however. Z.J.P. would have a different surname than his residential family and receive support from a father who resides elsewhere.[2] Such circumstances are relatively common today and are unlikely to have any negative impact on the quality of Z.J.P.'s life. Moreover, society's concern in shielding a child from the stigma of illegitimacy pales in comparison to its interest in securing financial support for a child's real needs for food, shelter and clothing.
The legislative comments to the New Jersey Parentage Act, N.J.S.A. 9:17-38 et seq., [hereinafter "Parentage Act"] noted that one-third of all children receiving assistance under the Aid to Families with Dependent Children Program are born out-of-wedlock. It was hoped that the Parentage Act would facilitate identification of a child's father and thereby reduce the number of children requiring public assistance. Assembly Judiciary, *190 Law, Public Safety and Defense Committee Statement, Senate No. 888-L. 1983, c. 17. In order to serve this policy, a biological father's obligation must be unaffected by the marital status of the mother, even if she is married to another. The Act unequivocally states, "[T]he parent and child relationship extends equally to every child and to every parent, regardless of the marital status of the parents." N.J.S.A. 9:17-40 (emphasis added). To hold otherwise would needlessly deprive a child of the primary recourse for child support.
In this case, if a concern about the "stigma" of illegitimacy is given priority, a consequence which cannot be ignored is the impact such a ruling would have on the child's financial security. As J.W.P. is essentially supported by her husband, Z.J.P.'s future financial welfare would depend in large measure upon the stability of his mother's marriage. Given the circumstances of this case, and this marriage, described by one counsel as "frail," that would be a particularly undesirable result.
W.W. also argues that J.H.P. should be estopped from denying paternity. There is no legal support for the defendant's position that equity may dictate the answer to the question, "Who is this child's biological father?" The cases relied upon, including our Supreme Court's decision in Miller, deal with the circumstances under which the support obligation of the biological parent may be assigned to a stepparent on the basis of equitable estoppel. W.W.'s request that this court's factual determination as to paternity be based upon allegedly equitable principles is a disingenuous effort to evade the legal consequences of the paternity decision. The real issue here is who will be responsible for supporting Z.J.P. and the equitable estoppel issue will be analyzed on that basis.
Previously, the equitable estoppel doctrine articulated in Miller has been applied in cases in which a custodial mother has sought continued support for her children from their stepfather. M.H.B. v. H.T.B., 100 N.J. 567, 498 A.2d 775 (1985); Bengis v. Bengis, 227 N.J. Super. 351, 547 A.2d 701 (App.Div. *191 1987); see also, Ross v. Ross, 126 N.J. Super. 394, 314 A.2d 623 (J. & D.R.Ct. 1973), aff'd, 135 N.J. Super. 35, 342 A.2d 566 (App.Div. 1975). Its application has consistently served the compelling need of the child to receive continuing financial support when the child has been effectively foreclosed from obtaining support from a natural parent by the stepfather's conduct. See also, A.S. v. B.S., 139 N.J. Super. 366, 354 A.2d 100 (Ch.Div. 1976), aff'd, 150 N.J. Super. 122, 374 A.2d 1259 (App.Div. 1977). The doctrine was not intended to compromise the natural parent's obligation. Indeed, the Supreme Court emphasized that the natural parent remained the primary recourse for child support. Rather, equitable estoppel was used to provide a safety net for the child whose stepfather has affirmatively interfered with his right to be supported by his natural father. Miller v. Miller, supra, 97 N.J. at 169-70, 478 A.2d 351.
In this case, it is the natural father who seeks to employ equitable estopped to extinguish his own support obligation. If permitted, this would be a plainly incongruous application of the Miller equitable estoppel doctrine.
Once described as a "principle of natural law," the duty of parents to support their minor children is both a moral and a legal obligation. Grotsky v. Grotsky, 58 N.J. 354, 356, 277 A.2d 535 (1971); Koidl v. Schreiber, 214 N.J. Super. 513, 515, 520 A.2d 759 (App.Div. 1986); N.J.S.A. 9:17-53; 1 W. Blackstone, Commentaries, S447. In emphasizing the natural parents' primary responsibility, the Supreme Court observed that "society and its current laws assume that the natural parent will support his or her child." Miller v. Miller, supra, 97 N.J. at 169, 478 A.2d 351.
The evidence in this case convincingly shows that W.W. knew that he was the father of Z.J.P. and consciously chose to deny that relationship once it became apparent that there were attendant financial obligations. His conduct to the present constitutes a violation of his legal and moral duty to support his child. Principles of justice demand that a party guilty of a *192 dereliction of a legal duty may not base a claim of estoppel upon his own wrongdoing or upon the acts of another induced by his conduct. Erlich v. First National Bank of Princeton, 208 N.J. Super. 264, 303-304, 505 A.2d 220 (Law Div. 1984). Having never provided for his child, equitable estoppel is not available to W.W. to shift his obligation to one who did care for his child.
Even if W.W.'s failure to provide support were not considered a violation of his legal duty precluding him from asserting equitable estoppel, the facts of this case do not support an application of the Miller estoppel doctrine.
The Court provided the following instructions which are plainly pertinent here:
If ... the wife knows where the natural father is, she has the burden to bring him before the court and to seek child support from him. Once in court the burden is on the natural father to show why he should not, in equity, be required to pay child support for his children. If the court finds that the natural father should not be required to pay child support due to the stepfather's conduct, the natural father having relied thereon and having placed himself in such a position that he is unable to meet that obligation, the stepparent should be responsible for the children's continued support. This, of course, is subject to modification or change whenever the natural father can meet his obligation.
Miller v. Miller, supra, 97 N.J. at 169, 478 A.2d 351.
Having been brought to court, W.W. bore the burden of showing why, in justice and good conscience, he should not be required to provide support for Z.J.P. He has failed to meet this burden.
First, the evidence is devoid of any representation by J.H.P. that he would assume the obligation of supporting Z.J.P., thereby relieving W.W. of his responsibility. There is some evidence that Z.J.P. has been presented to the world by name and identifying documents as J.H.P.'s son. This is not, however, the type of "representation" envisioned in Miller. While J.H.P. may have acquiesced in her actions, these "representations" are no more than J.W.P.'s transparent efforts to conceal the fact of her son's illegitimacy. The evidence shows that it *193 was J.W.P. and not J.H.P. who sought an adoption. Whatever support J.H.P. has provided has been given voluntarily, as the result of W.W.'s default of paternal obligations rather than as any representation by him to assume such obligations.
It was never intended that such "voluntary support" be discouraged by the Miller holding or that it provide a basis for the application of equitable estoppel. Acknowledging the persistent problem of collecting child support from recalcitrant spouses, the Court stated,
If a stepparent marries a divorced parent who is not receiving any child support, or if during their marriage the natural parent stops paying child support without interference from the stepparent, the stepparent does not thereby inherit the permanent support obligation of the nonpaying natural parent. The stepparent must take positive action interfering with the natural parent's support obligation to be bound.
Id. at 170, 478 A.2d 351. J.H.P. has done nothing to "cut off" support to Z.J.P. from W.W. The only reason that Z.J.P. has not received any support from W.W. is that W.W. has assumed an ostrich-like stance regarding his obligation. Moreover, W.W. has not altered his financial position in reliance upon any conduct of J.H.P. See, e.g., Bengis v. Bengis, supra, 227 N.J. Super. at 357, 360-361, 547 A.2d 701. J.H.P. has merely filled the void created by W.W.'s dereliction of duty.
Nonetheless, it is argued by W.W. that J.H.P. is the only father Z.J.P. has known and that as the "psychological father" he should bear the permanent support obligation. In M.H.B. v. H.T.B., supra, an equally divided Supreme Court affirmed the lower courts' decisions which imposed a support obligation on a stepparent under somewhat similar circumstances. The critical fact distinguishing this case from M.H.B. v. H.T.B. is that the natural father is a party to this action. Although the natural father was known in M.H.B. v. H.T.B., he had never had any contact with the child, who was then 8 years old. Of greater significance, he had never been brought to court to provide child support. Undoubtedly, the concurring justices found cause to relieve the natural mother of her obligation to seek such support. It may be that an application of M.H.B. v. H.T.B. *194 to the facts of this case would similarly absolve J.W.P. of such a duty if she had not brought this action. However, it is abundantly clear that the concurring opinion cannot be interpreted to support W.W.'s attempt to terminate his obligation even if J.H.P. were considered the "psychological" father. Recognizing "the exceptional nature of [the] relief" granted, Justice Handler wrote unequivocally that the determination "does not in any way mean that we exonerate or condone a biological father who abdicates his responsibility to support his child." Id. 100 N.J. at 579, 498 A.2d 775. Even in imposing the obligation on the stepparent, the concurring opinion noted that the relief remained subject to changing circumstances which could return the support obligation to the biological parent. Id. at 579-80, 498 A.2d 775.
Given the facts of this case, I therefore find that a natural father who has never provided financial support for his minor child may not employ equitable estoppel to terminate his support obligation.
The court's decision as to the amount of child support is contained in a written opinion dated November 6, 1990.
NOTES
[1] To protect the identity of the child, initials have been used. As the Plaintiff and one of the Defendants have the same initials, fictitious middle initials have been used.
[2] W.W. did not seek visitation in his counterclaim but did testify that if found to be the father, he would want to establish a relationship with his son. Neither J.W.P. nor J.H.P. oppose visitation.