788 A.2d 881 (2002)
347 N.J. Super. 33
L.V., Plaintiff-Appellant,
v.
R.S., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted September 17, 2001.
Decided January 24, 2002.
*882 Vincent E. Halleran, Jr., Freehold, attorney for appellant.
Goldstein & Bachman, East Brunswick, attorneys for respondent (Mark Goldstein, of counsel and on the brief).
Before Judges STERN, COLLESTER and LINTNER.
The opinion of the court was delivered by COLLESTER, J.A.D.
Plaintiff L.V. appeals from an order of the Family Court denying her application against defendant R.S. for child support on behalf of Michelle, born on January 5, 1982. We reverse and remand.
Plaintiff's complaint filed on July 28, 1998, initially sought an adjudication of paternity as well as child support, but defendant conceded the issue after genetic testing established a 99.99 percent determination of paternity. Consent orders limited the retroactivity of any child support award to the date of the filing of plaintiff's complaint. A pendente lite child support order was entered on November 19, 1999, fixing support at $183 per week and was payable through the probation department by way of a wage garnishment. A motion for enforcement was deferred until trial. In a related action defendant's wife filed a complaint against plaintiff alleging breach of an agreement by plaintiff to waive any claim for child support. That action was consolidated with plaintiff's complaint for support.[1]
Plaintiff and defendant had a social and sexual relationship which began in 1978 and ended in early 1981. Both characterized the relationship as "on-again/off-again," tumultuous, and at times abusive. After they ended the relationship, the parties met by chance at a bar in late April of 1991. Later that evening they engaged in sexual intercourse. About four months later plaintiff called defendant to advise that she was pregnant with his child and to ask for financial assistance for medical expenses related to the pregnancy. Defendant agreed and sent plaintiff $100.
Michelle was born on January 5, 1982, and was given her mother's surname. The birth certificate did not name defendant as her father. Plaintiff testified at the plenary hearing that she wanted no contact with defendant and did not want him to play any role in Michelle's life.
Subsequent contacts between the parties were minimal. When defendant asked mutual friends if plaintiff had had the baby, plaintiff called him and told him she had given birth about three months earlier. *883 She said that defendant expressed no desire to see Michelle. A month later defendant saw plaintiff and Michelle at a shopping mall, but no words were exchanged. Defendant testified he was convinced the child was not his because she had blond hair similar to plaintiff's former boyfriend. While plaintiff confirmed the chance encounter, she said that Michelle's hair was dark brown and not blond. Defendant also claimed he saw plaintiff at a bar on a subsequent date and that she refused to speak with him. Plaintiff denies any such meeting.
Seven years later defendant sent a letter to plaintiff informing her that he had become a born-again Christian and wished to make amends "for all the humiliation that I put you and your family through." The letter concluded:
I hope that you do get this letter. I have to send it to your mother's house because I don't know where you live. I know absolutely nothing about your life since last we spoke. I only know that you probably still hate me. I hope you don't. I am sorry that our relationship did not work, but I'm sure you agree, that it was not meant to be, even though we both tried very hard. I hope you have found true happiness and that you and your family are doing well. I am happy now and I know that being happy is what you wanted because you told me so during one of our fights. If you want to reach me, I will be working at Sea-Land Corp. in Elizabeth, at least for the next 2 years. But don't misunderstand me, I am not expecting any response from you. I only tell you this because I am not easily reached and I could not leave a return address. There are no hidden meanings in this letter, just take it for what it is, don't try to analyze it. I will not contact you again, so a threatening response from you will not be necessary. I hear that Michelle is a pretty young lady, you are a very lucky woman. I wish you well.
Plaintiff did not respond and made no effort to communicate with the defendant. She testified she was aware of how to proceed to secure child support for Michelle, but she consciously chose not to pursue any action against defendant.
Plaintiff did not hide from Michelle the identity of her father, and in the summer of 1998, when she was sixteen, Michelle made an effort to locate him. Using the Internet and then a Pennsylvania phonebook, she found a similar name and called the number. The person she called was defendant's brother, who gave her defendant's e-mail address. He also told defendant that he received a call from a girl claiming to be his daughter.
Shortly thereafter Michelle and defendant began communicating through e-mail. In the course of these computer conversations Michelle and her father introduced themselves and exchanged information as to the previously unknown lives of father and daughter. Defendant told Michelle he had three children from a current marriage, two from a prior marriage and lived with his wife in New Jersey after returning from Florida. Michelle e-mailed a current photograph and pictures of herself as a little girl.
For about two months defendant and Michelle exchanged numerous e-mails, sometimes several in a day. Defendant signed his mail as with "Dad" or "Bob." At one point he wrote to Michelle that her mother had called him at work. When Michelle reacted with anger at her mother, defendant calmed her by writing that he understood plaintiff's concern that Michelle not be hurt by a new relationship with her father.
After a few weeks, Michelle asked defendant for his address. He responded,
*884 Why do you want my address? I would give it to you, but I do have a family now that is my number one priority and I must protect them. Not that I think you are a danger but I need to be cautious. My address at work is:
Panasonic
50 Meadowland Parkway
Panazip 2C-3
Secaucus, N.J. 07094
Michelle e-mailed her father back the same day:
About your address ... you'll know soon enough why I wanted it. I told you from the start, [I] wasn't looking to contact you or send you a thing. Believe me its not something I would even use. Also like I told you before, I would find it out on my own and I have so you don't have to worry about it anymore.
At the support hearing Michelle acknowledged the reason she wanted defendant's address was so that he could be served with an application for child support, but she denied commencing the relationship for that reason. The complaint for support was filed by plaintiff on July 28, 1998, five days after defendant had given Michelle his work address, but defendant was not served until August 6, 1998. In the interim he and Michelle continued to e-mail about personal matters. Michelle wrote about her boyfriends, the movies she saw and the books she read. Defendant gave fatherly advice and more details about his life as well as the lives of his children and grandchildren.
When defendant was served with the complaint, he angrily e-mailed Michelle accusing her of conspiring with her mother, and starting the relationship to get money. Michelle responded in kind, and the fragile facsimile of their father-daughter relationship, as thin as tissue, was shredded as angry e-mails multiplied and then dissolved into silence.
The trial judge barred plaintiff's claim for child support on behalf of Michelle on grounds of laches.
We have a sixteen year hiatus of any contact between the defendant and his child. That creation of that hiatus was intentional and purposeful by the plaintiff. She did not want the defendant to be any part of her life, her life including her and her daughter whether she expressed that or not.
There was no bond between the defendant and the child. The short period of time of the emails back and forth may have been the start of an initiation of a relationship between the defendant and the child. But that cannot replace the sixteen years of absence of that relationship.
It can't at this point make up for the hurt that was in Michelle's eyes, the questions that the defendant may have had. And basically, I find that three and a half week, four week, of large number of emails, discounting what happened after the August 6th, is not evidence that a bond had been, or at that point in time could be reestablished between the defendant and Michelle.
In fact, based on Michelle's testimony yesterday, in light of what occurred post the August 6th serving of a complaint even though there is a closeness geographically in the location of her and the defendant, it appears to me that from her own words, at least in the near future, she doesn't really want to have a bond with the defendant because she interprets his actions and his words, some of which I find to be extremely hurtful no matter what happened on the serving of the complaint on August 6th.
She doesn't see him at this point as a father. Doesn't want him as father figure. *885 And it's unlikely that there will be a bond in the near future.

....
I find based upon that factor, based upon the apparent inability to reestablish a bond between the defendant and Michelle, that the concept and doctrine of laches has been established by a preponderance of the credible evidence by the defendant.
Laches is an equitable doctrine which penalizes knowing inaction by a party with a legal right from enforcing that right after passage of such a period of time that prejudice has resulted to the other parents so that it would be inequitable to enforce the right. Matter of Adoption of a Child of Indian Heritage, 111 N.J. 155, 182 n. 8, 543 A.2d 925 (1988). The key ingredients are knowledge and delay by one party and change of position by the other. See Allstate Ins. Co. v. Howard Sav. Inst., 127 N.J.Super. 479, 489-90, 317 A.2d 770 (Ch.Div.1974). As stated in Lavin v. Board of Educ. of City of Hackensack, 90 N.J. 145, 447 A.2d 516 (1982),
The length of delay, reasons for delay, and changing conditions of either or both parties during the delay are the most important factors that a court considers and weighs ... It is because the central issue is whether it is inequitable to permit the claim to be enforced that generally the change in condition or relations of the parties coupled with the passage of time becomes the primary determinant ... Inequity more often than not, will turn on whether a party has been misled to his harm by the delay.

[Id. at 152-53, 447 A.2d 516. (Citations omitted.) ]
While laches does not arise from delay alone, the actions and non-actions of the plaintiff are sufficient to justify the bar of laches to deny her any claim for reimbursement. The record shows that she was aware of procedures to obtain child support and to locate defendant but chose not to do so in order to inhibit any daughter-father relationship. The equitable balance therefore clearly favors defendant regarding any monetary claim by plaintiff. However, the issue sub judice involves not plaintiff's right to a monetary claim but rather the claim made on behalf of Michelle for on-going support. We hold that there is no basis to impute to a child the custodial parent's negligence, purposeful delay or obstinacy so as to vitiate the child's independent right of support from a natural parent. See Perez v. Singh, 21 Cal.App.3d 870, 97 Cal.Rptr. 920 (Cal.Ct. App.1971); Ellison v. Walter ex rel. Walter, 834 P.2d 680 (Wyo.1992).
The obligation to provide for maintenance of a child has long been a principle of common law. See, e.g., Greenspan v. Slate, 12 N.J. 426, 430, 97 A.2d 390 (1953) (citing I.W. Blackstone Commentaries on the Laws of England (1765) for the preposition that a parent's obligation is one of natural law). See also, Ionno v. Ionno, 148 N.J.Super. 259, 261-62, 372 A.2d 624 (App.Div.1977) ("The obligation of support springs from the parental relationship and is affected only by the needs of the children and the means of the parent to fulfill the obligation"). The Parentage Act, N.J.S.A. 9:17-38 to -59 gives statutory recognition to the independent right of a child to seek a judgment of paternity and support even though the action is filed by another with the child as a party. N.J.S.A. 9:17-45a, 47 and 53. We underscored this independent right of a child in E.I.B. by I.J. v. J.R.B., 259 N.J.Super. 99, 611 A.2d 662 (App.Div.), certif. denied, 130 N.J. 602, 617 A.2d 1223 (1992) by holding that a child is barred from relief by a prior paternity action only if the mother fully *886 represented the child's right in the prior proceeding.
Since welfare of children is a paramount concern, a public policy conflict arises from the application of the equitable doctrine of laches to a demand for child support. Guglielmo v. Guglielmo, 253 N.J.Super. 531, 546, 602 A.2d 741 (App. Div.1992). It is fundamental that the right to child support belongs to the child and may not be waived by a custodial parent. Kopak v. Polzer, 4 N.J. 327, 333, 72 A.2d 869 (1950); Martinetti v. Hickman, 261 N.J.Super. 508, 512, 619 A.2d 599 (App.Div.1993); Savarese v. Corcoran, 311 N.J.Super. 240, 246, 709 A.2d 829 (Ch. Div.1997), aff'd, 311 N.J.Super. 182, 709 A.2d 799 (App.Div.1998). Each parent is responsible to share the costs of providing for an unemancipated child. Ibid. Not even the absence of a meaningful relationship relieves the legally obliged parent from providing support for a child's basic needs. Fiore v. Fiore, 49 N.J.Super. 219, 227, 139 A.2d 414 (App.Div.), certif. denied, 28 N.J. 59, 145 A.2d 168 (1958); Martinetti, supra, 261 N.J.Super. at 513, 619 A.2d 599.
For this reason the application of laches to matters of parent-child relationships have been carefully circumscribed. In Matter of Adoption of a Child of Indian Heritage, supra, 111 N.J. at 182 n. 8, 543 A.2d 925, the Supreme Court indicated in a footnote that a hypothetical custody action would be barred if one had been filed four years after the child's birth. In Moore v. Hafeeza, 212 N.J.Super. 399, 515 A.2d 271 (Ch.Div.1986), the Chancery judge held that a plaintiff's action for support filed fifteen years after dismissal of the same claim filed by the Board of Social Services was barred by res judicata and collateral estoppel. The judge added by way of dicta that laches was an alternative basis for dismissal.
Plaintiff claimed in 1971 that defendant was the father of her child. Yet, for unexplained reasons, she did nothing for 15 years and now seeks to assert this claim in court. The unfairness to defendant is clear. Due to the passage of time not only has defendant been denied the right to attempt to develop a parent-child relationship with this 16-year old child, but he has incurred other obligations that would make it unfair to now burden him with the obligation to assume some of the costs for maintaining this child.

[Id. at 406, 515 A.2d 271.]
We considered the applicability of laches to a paternity and child support action in State v. Volk, 280 N.J.Super. 57, 654 A.2d 500 (App.Div.1995). In that case the first compliant was filed by the mother and subsequently dismissed because of a failure to appear at the scheduled hearing. Shortly thereafter the county welfare board filed a complaint for the same relief. After defendant denied paternity and agreed to take and pay for a blood test, the complaint was dismissed because the mother and child relocated to Virginia. Nine years later the mother initiated a petition in Virginia for establishment of paternity and for support under the Revised Uniform Reciprocal Enforcement of Support Act (RURESA), N.J.S.A. 2A:4-30.26 et seq. The trial judge denied defendant's motion to dismiss the RURESA complaint, citing Moore v. Hafeeza, supra, 212 N.J.Super. at 399, 515 A.2d 271. We reversed and dismissed the complaint on the ground of laches since the passage of time and the removal of the child from the State resulted in the total absence of any contact between parent and child.
[t]he child whose paternity and support has now been placed in issue grew to the age of nine with no opportunities for contact with Volk, much less any bonding *887 contact, and with no incidents of Volk's alleged paternity.
Even were Volk now determined to be the biological father of the child, it would be in name only. They are, by virtue of Longstreet's actions, total strangers, a status we deem to be irremediable, particularly given the child's remote domicile. We see little practical difference between the circumstances in the present suit and those considered to constitute laches in Hafeeza, supra, in which a natural mother's claim for paternity and support, brought fifteen years after dismissal of a prior proceeding, was held barred by laches. The nine years of non-contact since birth of the child has created a chasm that, as a practical matter, is no less wide than that in Hafeeza. It is too serious to bridge meaningfully and, together with Volk's diligent compliance with the first order, Longstreet's improper departure, and nearly eight years of inaction, affords ample basis for our conclusion that laches bars this complaint.

[Id. at 60-61, 515 A.2d 271.]
Although we found laches applicable in Volk, we took pains to declare that the child's rights were respecting paternity and support were independent of the mother.
In N.M. v. J.G., [255 N.J.Super. 423, 433, 605 A.2d 709 (App.Div.1992) ] we recognized the distinct interest of a child in vindicating his or her desire to know, for psychological and health reasons, the identity of a natural father, and declared that notwithstanding the laches of the plaintiff, a paternity action could be amended to include the child as plaintiff for such purposes, if in the child's best interests. To this we would add that upon an adequate showing that the mother is unable to provide reasonable support for a minor child, a guardian ad litem may also pursue his or her support interests to the extent not collaterally estopped by the mother's prior litigation.

[Id. at 62, 654 A.2d 500.]
Both Volk and Hafeeza are distinguishable. There is no prior order of dismissal on which defendant can claim reliance, and there was contact between father and daughter prior to the filing of the complaint seeking adjudication of paternity and support. While there was no communication with defendant for over sixteen years, Michelle sought out her father and established a relationship with him, albeit in cyberspace and short in duration. That fledgling relationship changed to distrust and anger on both sides after defendant reacted to the support complaint by railing Lear-like that Michelle and his mother "set him up." But however sharp the serpent's tooth, an ungrateful child does not relieve a parent of the duty of support. Martinetti, supra, 261 N.J.Super. at 513, 619 A.2d 599. Defendant acknowledged Michelle as his daughter in his e-mails and formally conceded paternity after genetic testing. It can scarcely be argued that Michelle would be estopped from seeking support for her father if her mother had died or abandoned her. We see no reason why he should not be compelled to support her in spite of plaintiff's actions. As her father, he owes her the duty of support regardless of the quality of their relationship. To the extent that either Volk or Hafeeza may be read to indicate that laches of the custodial parent may vitiate a child's right of on-going support, we disapprove and decline to follow such a holding.
Defendant successfully argued before the hearing judge that it would be inequitable to order him to pay child support for Michelle because he and his family incurred obligations and made decisions over sixteen years in ignorance of any *888 potential support claim. We disagree. There is no such tilting of an equitable balance to deprive his daughter of on-going support. If defendant was unaware of any potential child support claim, he is no more prejudiced than he would be with any unanticipated and adverse economic event. If he suspected his paternity, he has no secure ground to persuasively argue that he should not be held to this obligation. The fact that defendant's past confronted him with a new and unexpected financial obligation does not outweigh his legal and moral duty to contribute to the support of his natural unemancipated daughter.
We reverse and remand for a plenary hearing to determine an appropriate amount of child support consistent with defendant's income and other financial obligations made retroactive to the filing of the complaint. Plaintiff's prior request for counsel fees are to be addressed on remand.
Reversed and remanded.
NOTES
[1] The record below does not contain an order disposing of the contract action filed by defendant's wife. In light of our remand of plaintiff's complaint that action should be dismissed.