January 1, 2000, the date the $2000 sewerage connection fee took effect. The settlement agreement permits a refund for a $514 overcharge—the difference between the $2000 connection fee and the $1486 approved connection fee for the 2004 fiscal year—to "any person or entity which paid for a sewer connection permit from and after 1 November 2003."

Glen Eyre's claim that the refund should be retroactive to January 1, 2000 is without merit. The fiscal year to which the settlement applies runs from November 1, 2003 to October 31, 2004. The refund period mirrors the affected fiscal year for the new connection fee. The settlement permits any entity that connected during the applicable fiscal year and paid the $2000 charge to receive a refund. It was therefore not unreasonable to limit the refund to payments made after November 1, 2003.

Affirmed.

902 A.2d 261

J.R., PLAINTIFF–RESPONDENT, v. L.R., DEFENDANT–RESPONDENT, L.R., PLAINTIFF–RESPONDENT, v. S.G., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted February 15, 2006—Decided July 17, 2006.

Before Judges COBURN, COLLESTER and LISA.

*August J. Landi*, attorney for appellant.

Respondent J.R. has not filed a brief.

Respondent L.R. has not filed a brief.

The opinion of the court was delivered by

COLLESTER, J.A.D.

The focus of this case is fifteen-year-old Jessica, who has been denied love, comfort and support by two fathers: her biological father, who was unknown to her until these proceedings, and the man she called Dad for almost ten years. Following two plenary hearings Judge Daniel M. Waldman directed that each pay $75 per week for Jessica's support. Only S.G., the biological father, has appealed.

J.R. and L.R. were married on November 5, 1988. Two children were born during the marriage: Nicholas, born June 20, 1989, and Jessica, born January 19, 1991. The relationship between their parents was stormy and at times violent. After an argument in April 1990, L.R. went to a bar and met S.G., whom she had known before. Later they engaged in sexual intercourse. When she discovered she was pregnant, L.R. did not tell J.R. about her brief affair. J.R. raised Jessica as his daughter and had no reason to doubt he was her biological father until nine and one-half years later when L.R. said during an argument that S.G. was the father. J.R. called S.G. and told him what L.R. had said. Taken aback by the call, S.G. said he had no idea what L.R. was talking about.

J.R. and L.R. separated. L.R. remained in Florida with the children while J.R. moved to North Carolina. Later that summer Jessica, then nine years old, was on her computer conversing with J.R. on a live, on-line computer service called AOL Instant Messenger when he typed her a message saying she should find her real father and tell Nicholas that his father was dead. L.R. was in the same room with Jessica and told her that J.R. was just angry about the separation.[1] When Jessica continued to press her mother on the subject, L.R. told her there was a possibility that J.R. was not her father.

Despite all their problems, J.R. and L.R. reconciled in the fall of 2000, in North Carolina. The subject of whether J.R. was Jessica's "real father" was not discussed. The reconciliation failed, and in July 2001, L.R. moved with the children to Brick Township. A month later J.R. relocated to Brick and lived with his sister, hoping to reconcile with L.R. once again. But L.R. refused, and they remained separated while living in the same municipality.

During this time L.R. abused alcohol and was unable to support her children financially or emotionally. She applied for and received public assistance, and as a result, the Ocean County Board of Social Services, together with L.R., filed a complaint against J.R. for support of the two children. At an appearance before a hearing officer, J.R. raised the issue of paternity of the children and requested they be tested. The hearing officer explained she had no jurisdiction to decide the matter and submitted a recommendation that J.R. pay $193 per week for both children, which was adopted by the judge.

J.R. then filed a separate motion for paternity testing of the children using the docket number of the support action. Even though a paternity complaint had not been filed, an order was signed by the Family Part judge for genetic testing of J.R., Nicholas and Jessica. The results disclosed that J.R. was the

---

[1] J.R.'s recollection is that the conversation with Jessica was on the phone, but he does not deny the substance of what was said.

biological father of Nicholas but not Jessica. The judge then modified the support order to require that J.R. only pay support for Nicholas.

Five days later J.R. left New Jersey. He has lived outside this state since that time. While he has stayed in contact with Nicholas, his relationship with Jessica completely deteriorated. At Christmas in 2003 he sent her a gift with a note telling her he was sorry, that he loved her and wanted to be her friend. Jessica crumpled up the note. She has not seen or spoken to J.R. since early 2002.

After she received the order eliminating J.R.'s obligation to support Jessica, L.R. called S.G. She told him that the test showed J.R. was not Jessica's father and that she believed S.G. was the biological parent. She asked him to contribute money for her support, but he refused. L.R. then filed a paternity complaint in Monmouth County claiming that S.G. was Jessica's father and demanding he submit to genetic testing and pay support. An order for S.G. to submit to testing was entered by the Monmouth County judge but later was vacated after S.G. made a motion to vacate under *R.* 4:50–1(f) and raised the issue of whether such testing was in Jessica's best interests. *See M.F. v. N.H.*, 252 *N.J.Super.* 420, 429–30, 599 *A.*2d 1297 (App.Div.1991).

Meanwhile, J.R. filed a motion for a reduction in child support, for joint custody of both Jessica and Nicholas and for an order compelling L.R. to produce Jessica's biological father for a support hearing. The motion was consolidated with the paternity action and transferred to Monmouth County where the children lived. Judge Waldman appointed counsel to represent Jessica's interest on the issues of paternity and support. He also appointed Lillian Haber Gordon, L.C.S.W., to interview all parties to the action and submit a report as to whether Jessica's best interests would be served by the genetic testing. Gordon interviewed S.G. who told her that he wanted no relationship with Jessica under any circumstances and believed his other children would be emotionally harmed if they found out about her. Jessica told Gordon that she

did not want a relationship with J.R. but did want to know the identity of her natural father, even if he wanted nothing to do with her. Gordon concluded that Jessica deserved to know the identity of her biological father and recommended S.G. be ordered to submit to genetic testing.

Judge Waldman conducted a hearing over two days, during which J.R., L.R., S.G., C.G. (S.G.'s wife), Gordon and Jessica testified.[2] He issued a lengthy written opinion in which he concluded that the evidence and the genetic testing overcame the presumption of *N.J.S.A.* 9:17–43(a) that J.R. was Jessica's father and that there was an articulable reason to suspect S.G. was her biological parent. He also found that Jessica knew J.R. was not her father and that her relationship with him was "nearly non-existent." He said Jessica wanted to know the identity of her biological father even though she understood that if it was S.G., he probably would reject her. Accordingly, Judge Waldman held that the factors set forth in *M.F. v. N.H., supra,* 252 *N.J.Super.* at 429–30, 599 *A.*2d 1297, had been satisfied, and it was in Jessica's best interests to order that S.G. submit to genetic testing.

After the test results indicated a 99.9 percent probability that S.G. was Jessica's biological father, Judge Waldman held a hearing on the support issue. Both S.G. and J.R. testified and supplied proof of their income and expenses. Judge Waldman issued a comprehensive written opinion in which he held that as Jessica's biological father, S.G. was responsible for her support. However, he also found that S.G. was unable to pay the entire amount of her support because of his income and the financial demands of his family, including his other children. Finding that the proper support for Jessica required $150 per week, he directed S.G. to pay $75 per week. He then turned to J.R., whom he found to be Jessica's psychological father and found, based on his income

---

[2] Sadly, S.G. and C.G. declined to be present for Jessica's testimony, and J.R. left the courtroom shortly after her testimony began.

and expenses, that he should pay the remaining amount of Jessica's necessary support of $75 per week.

Only S.G. has appealed. He does not dispute that he is Jessica's biological father or contend he is unable to pay $75 per week for her support. He argues first that the orders directing that both he and J.R. submit to paternity testing were erroneous under the New Jersey Parentage Act, *N.J.S.A.* 9:17–38 to –59, as well as contrary to Jessica's best interests since the testing results were destructive to her relationship with J.R., who was the only father she had ever known.

■ Under the Parentage Act there is a presumption that a child born during marriage is the offspring of the husband. *N.J.S.A.* 9:17–43(a)(1). Since the Act disfavors a finding of illegitimacy, the presumption may be rebutted only by clear and convincing evidence that another man is the biological father and that " 'there is no possible escape' from that conclusion." *K.S. v. G.S.,* 182 *N.J.Super.* 102, 107, 440 *A.*2d 64 (Ch.Div.1981) (citing *In re Rogers' Estate,* 30 *N.J.Super.* 479, 485, 105 *A.*2d 28 (App.Div. 1954)); *N.J.S.A.* 9:17–43(b).

■ S.G.'s argument that the results of the genetic testing which excluded J.R. as Jessica's father should be suppressed as contrary to Jessica's best interests has no merit. Following a conference pursuant to *N.J.S.A.* 9:17–48 of the Parentage Act, a consent order was entered testing J.R. There is no record of any proceedings, and no appeal was taken. Although there was no finding that the testing of J.R. was in Jessica's best interests, the record is clear that Jessica had been told more than a year earlier by her mother and J.R. that he was not her natural father. In any event, we cannot turn back the clock and ignore the fact that prior to the paternity action against S.G., Jessica was fully aware that the genetic testing confirmed what she already knew and that there was no father/daughter relationship with J.R. to protect.

■ S.G.'s argument that he should not have been ordered to submit to testing is equally unpersuasive. The order was grounded on *N.J.S.A.* 9:17–41(g), which provides that,

[T]he child and other parties in a contested paternity case shall submit to a genetic test upon the request of one of the parties, unless that person has good cause for refusal, if the request is supported by a sworn statement by the requesting party: (1) alleging paternity and setting forth the facts establishing a reasonable possibility of the requisite sexual conduct between the parties. . . .

Judge Waldman made detailed factual findings to which we assign special deference. *Cesare v. Cesare,* 154 *N.J.* 394, 412–13, 713 *A.*2d 390 (1998). The record supports that there was much more than a reasonable possibility of the requisite sexual contact between L.R. and S.G. and that Jessica's desire to ascertain the identity of her biological father was in accord with her best interests. Accordingly, S.G. was properly ordered to submit to the testing.

■ S.G. next argues that since J.R. was and is Jessica's psychological parent, he should be solely responsible for her support under the doctrine of equitable estoppel. But it is settled law that the natural parent is the primary source for the support of a child, and the duty cannot be switched to a stepparent absent exceptional circumstances. *M.H.B. v. H.T.B.,* 100 *N.J.* 567, 579, 498 *A.*2d 775 (1985); *Miller v. Miller,* 97 *N.J.* 154, 169, 478 *A.*2d 351 (1984); *Christensen v. Christensen,* 376 *N.J.Super.* 20, 27–28, 868 *A.*2d 1143 (App.Div.2005); *J.W.P v. W.W.,* 255 *N.J.Super.* 1, 3, 604 *A.*2d 603 (App.Div.1991). That exception arises when a stepfather actively interferes with the child's support from the natural father, and, as a result, he may be equitably estopped from disclaiming that obligation in the future. *Miller, supra,* 97 *N.J.* at 169, 478 *A.*2d 351. As we stated in *J.W.P. v. W.W.,* equitable estoppel is "a safety net for the child whose stepfather has affirmatively interfered with his right to be supported by his natural father." *Id.* at 3, 604 *A.*2d 695 (citing *J.W.P. v. W.W.,* 255 *N.J.Super.* 185, 191, 604 *A.*2d 695 (Ch.Div.1990)). This exception is obviously inapplicable here. J.R. never interfered with a relationship between S.G. and Jessica. They have never had a

relationship and, sadly, probably never will. Moreover, while three justices in the equally divided decision of *M.H.B. v. H.T.B.*, *supra*, 100 *N.J.* at 567, 498 *A.2d* 775, expressed a willingness to extend equitable estoppel beyond *Miller* to cover a situation where a child relied upon a stepfather's knowing and purposeful representation of continued support, *Id.* at 576–77, 498 *A.2d* 775, the case is factually distinguishable. There the stepfather continued to treat the child as his daughter despite knowing she was not, and he even signed an agreement for her support that was incorporated in his divorce from the mother. In this case, the relationship between J.R. and Jessica was shredded even before the test confirmed that he was not her biological father. There is no basis to impose equitable estoppel upon J.R. to bear the entire burden of Jessica's support and excuse any financial participation by her natural father.

■ Finally, S.G. contends that it is simply inequitable to require him to be financially responsible for Jessica after so much time passed before L.R. made him aware of Jessica's existence and also because acknowledging and supporting her would harm his wife and other children. But reality cannot be ignored, and the reality is that S.G. has a daughter who is in need of support and is legally entitled to it. As her father, S.G. is responsible for her proper support to the extent that he is financially able, even though there is no relationship between them. *N.J.S.A.* 9:17–55; *Miller, supra*, 97 *N.J.* at 169, 478 *A.2d* 351; *L.V. v. R.S.*, 347 *N.J.Super.* 33, 41–43, 788 *A.2d* 881 (App.Div.2002). Finally, the result is hardly inequitable in light of the fact that Judge Waldman found S.G. could not bear the entire burden of supporting Jessica and directed that J.R., as her psychological father, should equally share in the responsibility. *See Christensen, supra*, 376 *N.J.Super.* at 24, 868 *A.2d* 1143; *Bengis v. Bengis*, 227 *N.J.Super.* 351, 360–61, 547 *A.2d* 701 (App.Div.1987). The decision is legally correct and equitably just.

Affirmed.