# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ROBERT GARFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0917-KSJM |
| | ) | |
| BLACKROCK MORTGAGE VENTURES, LLC, BLACKROCK, INC., HC PARTNERS, LLC, STANFORD L. KURLAND, DAVID A. SPECTOR, ANNE D. MCCALLION, MATTHEW BOTEIN, FARHAD NANJI, MARK WIEDMAN, JOSEPH MAZELLA, and ANDREW S. CHANG, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PENNYMAC FINANCIAL SERVICES, INC., | ) ) ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 10, 2019
Date Decided: December 20, 2019

Kurt M. Heyman, Aaron M. Nelson, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Jason M. Leviton, Joel A. Fleming, Amanda R. Crawford, BLOCK & LEVITON LLP, Boston, Massachusetts; *Counsel for Plaintiff Robert Garfield*.

Kenneth J. Nachbar, MORRIS NICHOLS ARSHT & TUNNELL, Wilmington, Delaware; Deborah S. Birnbach, Jennifer B. Luz, Katherine B. Dacey, GOODWIN PROCTER LLP, Boston, Massachusetts; *Counsel for Defendants Stanford L.*

*Kurland, David A. Spector, Anne D. McCallion, Matthew Botein, Farhad Nanji, Mark Wiedman, Joseph Mazzella, Andrew S. Chang, and Nominal Defendant PennyMac Financial Services, Inc*.

Kevin R. Shannon, Berton W. Ashman, Jr., Callan R. Jackson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; John P. Coffey, Adina C. Levine, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York; *Counsel for Defendants BlackRock Mortgage Ventures, LLC and BlackRock, Inc*.

David E. Ross, S. Michael Sirkin, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Counsel for Defendant HC Partners, LLC*.

**McCORMICK, V.C.**

This action challenges the fairness of a reorganization that transformed PennyMac from an "Up-C" structure to a simple corporate form. The reorganization created benefits for the defendants who held units in the company's operating subsidiary, but not for the stockholders who held Class A common stock in the parent corporation. The plaintiff holds Class A common stock and argues that the reorganization should be subject to the entire fairness standard of review. The defendants moved to dismiss pursuant to Court of Chancery Rule 12(b)(6), arguing they should obtain the benefit of the business judgment rule under *Corwin* because a majority of disinterested stockholders approved the transaction.

Under Delaware law, a stockholder vote cannot restore the business judgment rule under *Corwin* when there is a controller that benefits personally from the transaction. Following this logic, this decision finds *Corwin* is inapplicable because the complaint supports a reasonably conceivable inference that two large PennyMac stockholders constituted a control group that stood to benefit from the reorganization. This decision further finds that the complaint states a claim when evaluated under the entire fairness standard.

1

## I. FACTUAL BACKGROUND

The background facts are drawn from the Verified Amended Class Action and Derivative Complaint (the "Amended Complaint"),[1] exhibits attached to the Amended Complaint, documents it incorporates by reference, and any judicially noticeable sources.

### A. BlackRock and HC Partners Launch PennyMac.

During the financial crisis of 2008, BlackRock, Inc.[2] and Highfields Capital Management ("HC Partners")[3] perceived a market opportunity to acquire loans from financial institutions who were "seeking to reduce their mortgage exposures."[4] For that purpose, they formed Private National Mortgage Acceptance Company, LLC ("PennyMac, LLC"). The press release announcing PennyMac, LLC's formation referred to BlackRock and HC Partners as "strategic partners" who could "enhanc[e] PennyMac's relationships with global financial institutions and provid[e] valuable

---

[1] C.A. No. 2018-0917-KSJM Docket ("Dkt.") 39, Verified Am. Class Action and Derivative Compl. ("Am. Compl.").

[2] BlackRock Mortgage Ventures, LLC is also a named defendant. BlackRock, Inc. owned its stake in the PennyMac entities through BlackRock Mortgage Ventures, LLC. At no time did BlackRock, Inc. directly own a stake in PennyMac. For ease, this opinion refers to these two entities collectively as "BlackRock."

[3] HC Partners, LLC was formerly known as Highfields Capital Management. The Amended Complaint references Highfields Capital Management, but the parties adopted "HC Partners" to minimize confusion.

[4] Am. Compl. ¶ 39.

input in structuring PennyMac's investment management activities."[5] BlackRock and HC Partners signed the PennyMac LLC Agreement (the "LLC Agreement"),[6] which afforded them certain rights and preferences. These included the right to veto certain LLC actions and to call an official meeting at any time.

In 2009, PennyMac, LLC formed PennyMac Mortgage Investment Trust (the "Public REIT"). The Public REIT was externally managed by PNMAC Capital Management, LLC (the "REIT Manager"), a subsidiary of PennyMac, LLC. In its initial public offering, the Public REIT sold 93.5% of its shares to public investors and 6.5% of its shares to BlackRock, HC Partners, and management. The offering documents again described BlackRock and HC Partners as "strategic partners."[7]

### B. The Up-C Transaction

In 2013, BlackRock, HC Partners, and former PennyMac CEO Stanford L. Kurland took the PennyMac structure public in an "Up-C" transaction. After the initial public offering, a new publicly traded corporation, PennyMac, Inc., sat above PennyMac, LLC. PennyMac, Inc. issued Class A common stock to the new public

---

[5] *Id.*

[6] Dkt. 48, Opening Br. in Supp. Of Def. HC Partners, LLC's Mot. to Dismiss ("HC P'rs Opening Br.") Ex. B. The Amended Complaint quotes from the LLC Agreement and thus incorporates it by reference. *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016) ("The incorporation-by-reference doctrine permits a court to review the actual document to ensure that the plaintiff has not misrepresented its contents and that any inference the plaintiff seeks to have drawn is a reasonable one.").

[7] Am. Compl. ¶ 53.

3

stockholders who participated in the public offering. These Class A common stockholders owned 15% of the voting rights and 100% of the economic rights to PennyMac, Inc. PennyMac, Inc. also issued Class B common stock to existing PennyMac, LLC Unitholders (the "LLC Unitholders"). The LLC Unitholders held the remaining 85% of the voting rights of PennyMac, Inc. through their Class B shares; they continued to derive their economic benefits solely from ownership of the subsidiary LLC. For ease, this decision refers to PennyMac, Inc. and PennyMac, LLC together as "PennyMac" unless a distinction is necessary.

The Up-C public offering documents described BlackRock and HC Partners as "strategic investors" who supported PennyMac's senior management in "organiz[ing] PennyMac and assembl[ing] a team with the knowledge and experience" to identify market opportunities and create value for stockholders.[8] PennyMac, LLC's filings in connection with the public offering also describe BlackRock and HC Partners as "strategic partners" who, along with members of management, founded the original LLC.[9]

## C. IPO-Related Agreements

Two agreements executed in conjunction with the 2013 Up-C transaction allowed the LLC Unitholders to take advantage of the tax-friendly Up-C structure.

---

[8] *Id.*

[9] *Id.* ¶ 54.

4

The first, the "Exchange Agreement," allowed LLC Unitholders to exchange their LLC Units for Class A common stock in PennyMac, Inc. on a one-for-one basis. These exchanges created potential tax liability for the LLC Unitholder but provided potential tax benefits to PennyMac, Inc. The second, the "Tax Receivable Agreement," entitled LLC Unitholders to payment of 85% of any such tax benefit enjoyed by PennyMac, Inc. Thus, only 15% of any tax benefits from these exchanges remained with the PennyMac, Inc. Blackrock and HC Partners are co-signatories the Tax Receivable Agreement.

### D. Lead Up to the Reorganization

Although the Up-C structure was designed in part to allow LLC Unitholders to more easily realize tax benefits, these benefits did not materialize for two reasons. First, the federal government passed the Tax Cuts and Jobs Act of 2017, which reduced the top marginal corporate tax rate from 35% to 21%. This reduction in the tax rate reduced the expected future value of PennyMac, LLC's tax assets accumulated due to historical net operating losses. Separately, PennyMac, LLC's business changed. Its loan production volume grew significantly, and tax laws allowed it to defer revenue associated with mortgage servicing rights. This deferral resulted in current period tax losses for PennyMac, LLC.

Given these changes, management did not expect to earn taxable income for at least a decade, which would render the tax benefits afforded by the Up-C structure

5

irrelevant.[10]  As the Amended Complaint explains, "[t]here is no need to avoid double taxation if you do not have taxable income."[11]  The LLC Unitholders thus faced a problem: the Up-C structure was a wash for them and it limited their access to the liquidity of public markets, but exchanging their units for shares of Class A common stock would be treated as a taxable event taxed as ordinary income rather than capital gains.  All of the defendants owned significantly more LLC Units than Class A common stock and thus faced the same dilemma.[12]

## E.    The Reorganization

On February 28, 2018, Kurland introduced the idea of a capital structure reorganization (the "Reorganization") to the PennyMac, Inc. Board of Directors (the "Board").  After Kurland introduced the proposal, the Board "requested that

---

[10] *Id.* ¶ 65.

[11] *Id.* ¶ 66.

[12] Plaintiff alleges that each Defendant's holdings was economically material because PennyMac, Inc. Class A common stock closed at $19.20 per share on August 2, 2018, the day that the Reorganization was announced. *Id.* ¶ 59 n.15.  These holdings are summarized in the following chart:

| Defendant | Class A Common Stock | LLC Units |
|---|---|---|
| BlackRock | 1,800,000 | 13,760,647 |
| HC Partners | 0 | 20,169,732 |
| Kurland | 0 | 8,314,990 |
| Spector | 244,680 | 1,699,729 |
| McCallion | 115,980 | 510,720 |
| Botein | 15,765 | 718,552 |
| Nanji | 50,213 | 122,109 |
| Wiedman | 21,429 | 54,556 |
| Mazzella | 453,552 | 738,083 |
| Chang | 134,617 | 856,671 |

management present potential ways to reorganize the Company and authorized management to discuss potential reorganization options with the holders of our Class B common stock."[13] The Reorganization was designed to allow all of the LLC Unitholders to exchange their LLC Units for PennyMac, Inc. Class A common stock in a tax-free exchange *and* receive long-term capital gains treatment on future sales of the newly acquired Class A common stock as long as those shares were held for more than one year.[14]

Approval of the Reorganization required a majority vote of the PennyMac, Inc. stockholders voting as a single class.[15] As discussed above, Class A common stockholders controlled 15% of the voting rights under the Up-C structure, while LLC Unitholders controlled the remaining 85% through their ownership of Class B common stock. At the time the Reorganization was proposed, there were 25.2 million outstanding shares of Class A common stock and 52.3 million shares of Class B common stock for a combined total of 77.5 million votes. Through their respective holdings, Kurland controlled approximately 8.3 million (10.7%) of those

---

[13] *Id.* ¶ 68. Plaintiff alleges that this purported authorization was illusory because while it is summarized in the proxy statement issued in connection with the Reorganization, it is not reflected in the formal minutes of the board meeting. *Id.*; Defs.' Opening Br. Ex. C. ("Proxy") at 45. The Amended Complaint incorporates the Proxy by reference and it is thus appropriately considered on this motion. *See Amalgamated Bank* 132 A.3d at 797.

[14] The long-term capital gains rate would be in place of the ordinary income rate that would otherwise apply to such an exchange.

[15] Proxy at 2.

votes;[16] BlackRock controlled approximately 15.6 million (20.1%) of those votes;[17] and HC Partners controlled approximately 20.2 million of those votes (26%);[18] Thus, the proponent of the Reorganization—Kurland—required the support of only BlackRock and HC Partners to approve the Reorganization.

Eleven persons comprised the Board that recommended stockholders vote in favor of the Reorganization. Seven directors, all named as defendants in this action (the "Director Defendants"),[19] owned more LLC Units than shares of Class A common stock. Of the Director Defendants: BlackRock appointed one of its employees and one of its consultants, Mark Wiedman and Matthew Botein, respectively; HC Partners appointed its general counsel and a former employee, Joseph Mazella and Farhad Nanji, respectively; and PennyMac, Inc. officers Kurland, David A. Spector, and Anne D. McCallion also served. The remaining directors were James Hunt, Patrick Kinsella, Theodore Tozer, and Emily Youssouf, none of whom are named as defendants to this lawsuit.

---

[16] *Id.*

[17] *Id.* at 70.

[18] *Id.*

[19] Andrew Chang was the Chief Financial Officer of PennyMac, Inc. and is a named defendant in this action as well. The parties refer to the Director Defendants and Chang as the "Individual Defendants." Chang also owned more LLC Units than shares of Class A common stock. Am. Compl. ¶ 59.

Members of PennyMac, Inc. management made a presentation to Blackrock and HC Partners contemporaneously concerning the Reorganization on April 24, 2018. The presentation depicted BlackRock, HC Partners, and management as a single group. It also quantified the size of the tax savings for parties subject to the individual rate to be approximately $3.21 per Unit. This quantification relied upon various assumptions relating to the party's tax situation, including that the party was a California resident with a specified tax basis and subject to the highest marginal state and federal tax rates. A week later, management held a conference call with BlackRock and HC Partners regarding the proposed transaction.

Management made a formal presentation to the Board about the proposed transaction on May 30, 2018. Kurland opened the Board's discussion by noting that BlackRock and HC Partners were "inclined to support the proposal."[20] Kurland then turned the meeting over to Chang and attorneys from Goodwin Procter LLP ("Goodwin Procter"). According to the minutes of the meeting, Chang identified the benefits of the Reorganization, which included "more favorable tax treatment for [LLC] unit holders."[21] BlackRock had conducted its own internal evaluation of the Reorganization considering possible future scenarios depending on a variety of

---

[20] *Id.* ¶ 74.

[21] *Id.*

9

differing assumptions regarding PennyMac's profitability. Wiedman offered to make BlackRock's analysis available to the Board as well.

The next day, the Board established a special committee comprised of Hunt, Kinsella, Tozer, and Youssouf (the "Special Committee") to evaluate the Reorganization. The resolution forming the Special Committee provided that "after having made a decision with respect to the Potential Transaction, the Special Committee's authority shall be limited to making a recommendation to the Board of Directors, rather than giving final approval to or implementing such action or transaction."[22]

On June 2, 2018, the Special Committee held a conference call with management and Goodwin Procter. According to the minutes of that meeting, "[o]ne of the Committee members asked whether the Committee should consider retaining independent counsel."[23] The Special Committee never retained another law firm, and Goodwin Procter was its sole legal advisor.

On June 11, 2018, management presented the Special Committee with an analysis showing that the Reorganization would reduce PennyMac, Inc.'s book value from $20.61 per share to $19.65 per share. The next day, the Special Committee

---

[22] *Id.* ¶ 75.

[23] *Id.* ¶ 76.

held a conference call with management and Goodwin Procter to discuss this decline.

On June 15, 2018, the Special Committee met and discussed whether PennyMac, Inc. should issue a special dividend (the "Distribution") to the holders of Class A common stock. Later that day, the Special Committee convened telephonically, along with Wiedman and another BlackRock managing director, Tom Wojcik. Wojcik shared that "in BlackRock's opinion, the various benefits resulting from the [Reorganization] were likely to outweigh the loss of BlackRock's potential benefits under the Company's Tax Receivable Agreement."[24]

Two weeks later on June 29, 2018, the Special Committee met and discussed "the excess cash that accumulated at the [PennyMac, Inc.] level since the IPO in 2013 as a result of, among other things, tax distributions from [PennyMac, LLC] that exceeded [PennyMac, Inc.'s] actual tax liability."[25] The Special Committee discussed two possible alternatives to "distribute some or all of this value to Class A common stockholders."[26] The first alternative was the Distribution, and the second was to adjust the ratio of shares to be issued to holders of Class A common stock in connection with the Reorganization. On July 13, 2018, the Special Committee met

---

[24] *Id.* ¶ 80.

[25] *Id.* ¶ 82.

[26] *Id.*

11

with Goodwin Procter, Chang, and other members of management to review a presentation regarding the two alternatives. Chang recommended the Distribution instead of a change to the exchange ratio.

On July 18, 2018, the Special Committee acted by written consent to recommend approval of the Reorganization to the full Board. As a condition precedent to the Reorganization, PennyMac, Inc. Class A common stockholders would receive the Distribution of approximately $10.1 million ($0.40 per share).

On July 24, 2018, the full Board met and approved the Reorganization. The Board also directed the officers of PennyMac, Inc. to attempt to cause each of the LLC Unitholders to execute and become party to the proposed contribution agreement and plan of merger.

At some point before the Board next convened, HC Partners and Blackrock negotiated to revise the terms of the Reorganization "adding a provision stating that the consent of BlackRock and [HC Partners] was required to terminate the Reorganization prior to the effective date."[27] On August 2, 2018, the full Board met to approve the revised proposed contribution agreement and plan of merger that

---

[27]*Id.* ¶ 87; *see* Proxy Annex 1 at 15 ("This Agreement may be terminated and the Reorganization contemplated hereby may be abandoned at any time prior to the Effective time . . . by written notice of the Contributors holding at least a majority of the [LLC] Units then outstanding (*which majority must include each of* [*HC Partners*] *and* [*BlackRock*]) . . . ." (emphasis added)).

reflected these changes.[28]

The Reorganization was not conditioned on majority-of-the-minority approval. Rather, the Proxy informs that "[e]ven if no affirmative votes of Class A common stockholders are cast in favor of the Reorganization Proposal, the Reorganization Proposal will be approved if a sufficient number of votes of Class B common stockholders [*i.e.*, [LLC Unitholders]] are cast in favor of the Reorganization Proposal."[29]

On August 2, 2018, the Board declared and publicly announced the Distribution, which was issued on or around August 30, 2018. Later that day, PennyMac, Inc. publicly announced the Reorganization. PennyMac, Inc. issued the Proxy on September 18, 2018. Stockholders voted to approve the Reorganization on October 24, 2018, and the Reorganization closed on November 1, 2018.

## F. The Proxy and the Stockholder Vote

The Amended Complaint alleges that the stockholder vote was uninformed and identifies two categories of disclosure deficiencies concerning (1) projections of PennyMac's future profitability and (2) the quantification of tax benefits for LLC Unitholders.

---

[28] Am. Compl. ¶ 87; Proxy at 48.

[29] Am. Compl. ¶ 88; Proxy at 20.

13

### 1. Projections

The Amended Complaint alleges that the following Proxy disclosure regarding projections for PennyMac's future profitability is incomplete:

> On June 15 . . . the Special Committee held a conference call with BlackRock regarding forecasts and estimates that were provided to the Special Committee by management and sought BlackRock's views on the benefits of the reorganization transaction versus the benefits under the Tax Receivable Agreement. The forecasts and estimates prepared by management primarily showed that [PennyMac, Inc.] would not generate taxable income in the near-term and minimal taxable income in the long-term. As a result, the forecasts and estimates helped advise the Special Committee that the net present value of potential benefits to holders of Class A Common Stock resulting from future exchanges of [PennyMac, LLC Units] would likely be nominal.[30]

Plaintiff contends that a number of additional facts regarding management's projections are material and merited disclosure.

First, in the Special Committee's June 12, 2018, meeting, one of the Special Committee members asked whether the Company would provide earnings forecasts. Chang confirmed the Company would not, even though there was significant discussion "with respect to the relevance of the earnings projections to the Company's Class A common stockholders in contrast to [PennyMac, LLC's] unit holders."[31]

---

[30] Am. Compl. ¶ 94; Proxy at 46.

[31] Am. Compl. ¶ 95.

Second, On April 24, 2018, BlackRock and HC Partners reviewed the first presentation regarding the Reorganization that contained management base-case projections. The Board reviewed these same projections during its meeting on May 30, 2018.

Third, BlackRock subsequently requested that management run three additional scenarios, which included:

> Mid Growth Scenario (5% market growth) – halfway between management base case market share and the steady state scenario below
>
> Steady State Scenario (5% market growth) – No market share gains, just market growth at 5% from 2020 onwards (2018 and 2019 are the average of Fannie/Freddie/MBA forecasts)
>
> Steady State Scenario (2.5% market growth) – No market share gains, just market growth at 2.5% from 2020 onwards (2018 and 2019 are the average of Fannie/Freddie/MBA forecasts).[32]

BlackRock then requested two additional scenarios on top of that:

> Management Base Case (2.5% market growth) – Management base case market share gains, but the market grows at 2.5% from 2020 onwards
>
> Bank Competitor Case – A major bank decides to re-enter the mortgage market in 2021 and market share and margins suffer as a result.[33]

---

[32] *Id.* ¶ 97.

[33] *Id.*

Each of these scenarios (collectively, the "BlackRock Scenarios") contains detailed ten-year projections of revenue, expenses, taxable income, and expected payments under the Tax Receivable Agreement. The line-by-line results of these analyses were not disclosed.

### 2. The Tax Benefits

The Proxy also does not disclose management's analysis of quantification of the tax savings that LLC Unitholders could enjoy due to the Reorganization. As discussed above, management was told that the LLC Unitholders could save up to $3.21 per Unit by receiving long-term capital gains treatment on their exchange of LLC Units via the Reorganization, compared to ordinary-income treatment under the Up-C structure.

Plaintiff points to a chart included in a presentation released by PennyMac, Inc. as evidence of the disparate benefits given to the LLC Unitholders at the expense of Class A common stockholders. The Class A common stockholders would give up 15% of the potential tax benefits realizable under the Tax Receivable Agreement, and LLC Unitholders would give up 85% of the same tax benefits. In return, both the Class A common stockholders and the LLC Unitholders would enjoy a simplified corporate structure that expands the potential investor universe and demand for PennyMac, Inc. stock. The LLC Unitholders would also enjoy long-term capital

gains treatment on stock sales as opposed to being taxed at rates for ordinary income. The Class A common stockholders would not enjoy a similar benefit.

## G.    This Litigation

Plaintiff Robert Garfield ("Plaintiff") claims to have been a beneficial owner PennyMac, Inc. Class A common stock since December 10, 2015.  Plaintiff filed the Verified Class Action and Derivative Complaint on December 20, 2018.  Plaintiff brings two causes of action: a direct claim for breach of fiduciary duty against Defendants, and, in the alternative, a derivative claim for the same breaches of fiduciary duty.[34]  In response to Defendants' initial motion to dismiss, Plaintiff filed the Amended Complaint on March 11, 2019.  Defendants renewed their motion to

---

[34] According to the Proxy, Plaintiff became a beneficial owner of common stock of "New PennyMac" by operation of the Reorganization.  In the Amended Complaint, Plaintiff argues that he maintains standing to pursue his claims derivatively, although his shares of Class A common stock were automatically converted into shares of common stock of "New PennyMac" in the merger, because the continuous-ownership requirement should not apply when "the merger is in reality merely a reorganization."  Am. Compl. ¶ 10 n.6 (citing *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 354 (Del. 1988)). The Defendants did not take on this issue in their motion to dismiss.  Nor did the Defendants move to dismiss the claims styled as "derivative" under Court of Chancery Rule 23.1.

dismiss on March 25, 2019.  The parties fully briefed the motion by May 6, 2019,[35]

and the Court heard oral arguments on September 10, 2019.[36]

## II.    LEGAL ANALYSIS

Defendants moved to dismiss the Amended Complaint pursuant to Court of

Chancery Rule 12(b)(6).  Under Rule 12(b)(6), the Court may grant a motion to

dismiss for failure to state a claim if a complaint does not allege facts that, if proven,

would entitle the plaintiff to relief.[37]  "[T]he governing pleading standard in

Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[38]  When

considering such a motion, the Court must "accept all well-pleaded factual

allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of

the plaintiff, and deny the motion unless the plaintiff could not recover under any

---

[35] Dkt. 46, Opening Br. in Supp. of Defs. Stanford L. Kurland, David A. Spector, Anne D. McCallion, Matthew Botein, Farhad Nanji, Mark Wiedman, Joseph Mazzella, Andrew S. Chang and PennyMac Financial Services, Inc.'s Mot. to Dismiss the Verified Am. Class Action and Derivative Compl. ("Ind. Defs.' Opening Br."); Dkt. 47, Opening Br. in Supp. of the Mot. to Dismiss of BlackRock Mortgage Ventures, LLC and BlackRock, Inc.; HC P'rs Opening Br.; Dkt. 57, Pl.'s Omnibus Answering Br. in Opp'n to Defs.' Mots. to Dismiss Pl.'s Verified Am. Class Action and Derivative Compl. ("Pl.'s Answering Br."); Dkt. 59, Reply Br. in Further Supp. of Defs. Stanford L. Kurland, David A. Spector, Anne D. McCallion, Matthew Botein, Farhad Nanji, Mark Wiedman, Joseph Mazzella, Andrew S. Chang and PennyMac Financial Services, Inc.'s Mot. to Dismiss the Verified Am. Class Action and Derivative Compl. ("Ind. Defs.' Reply Br."); Dkt. 60, Reply Br. in Further Supp. of the Mot. to Dismiss of BlackRock Mortgage Ventures, LLC and BlackRock, Inc.; Dkt. 61, Reply Br. in Supp. of Def. HC Partners, LLC's Mot. to Dismiss.

[36] Dkt. 75, Oral Arg. on Defs.' Mots. to Dismiss ("Oral Arg. Tr.").

[37] Ct. Ch. R. 12(b)(6).

[38] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

18

reasonably conceivable set of circumstances susceptible of proof."[39]  The reasonable conceivability standard asks whether there is a possibility of recovery.[40]  The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[41]

In support of dismissal, Defendants argue that the business judgment standard of review applies under *Corwin* because a fully informed, uncoerced majority vote of disinterested stockholders approved the Reorganization, and that the Amended Complaint fails to state a claim under the business judgment standard.[42]  Even if entire fairness is the appropriate standard of review, Defendants contend that Plaintiff has not alleged facts to suggest the Reorganization was not entirely fair.

Plaintiff responds that *Corwin* is inapplicable because the Amended Complaint adequately pleads the existence of a controlling stockholder group whose self-interest diverged from that of other stockholders.[43]  Plaintiff further responds

---

[39] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[40] *Id.* at 537 n.13.

[41] *Price v. E.I. du Pont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[42] Ind. Defs.' Opening Br. at 37–56; Ind. Defs.' Reply Br. at 7–24.

[43] Pl.'s Answering Br. at 36–43; *see Larkin v. Shah*, 2016 WL 4485447, at *1 (Del. Ch. Aug. 25, 2016) ("In the absence of a controlling stockholder that extracted personal benefits, the effect of disinterested stockholder approval of the merger is review under the irrebutable business judgment rule . . . ."); *In re Merge Healthcare Inc.*, 2017 WL 395981, at *6 (Del. Ch. Jan. 30, 2017) ("Importantly, there mere presence of a controller does not trigger entire fairness *per se*.  Rather, coercion is assumed, and entire fairness invoked, when the controller . . . sits on both sides of the transaction, or is on only one side but

19

that the Amended Complaint adequately states a claim under the entire fairness standard.

## A.     Standard of Review

A stockholder vote cannot restore the business judgment rule under *Corwin* when there is "a controlling stockholder that extract[s] personal benefits" from the transaction.[44]  This is because "the controller's presence is said to exert 'inherent coercion'" on "both corporate decision-making bodies to which Delaware courts ardently defer—the board of directors and disinterested voting stockholders."[45]  To neutralize these concerns and benefit from the business judgment standard, the parties to a controller transaction must implement the procedural safeguards set forth in *MFW* to simulate arm's length negotiations.[46]  Because the Reorganization was

'competes with the common stockholders for consideration.'" (quoting *Larkin*, 2016 WL 4485447, at *8)).

[44] *van der Fluit v. Yates*, 2017 WL 5953514, at *5 (Del. Ch. Nov. 30, 2017) (citing *Merge Healthcare*, 2017 WL 395981, at *6); *see Larkin*, 2016 WL 4485447, at *1 ("In the absence of a controlling stockholder that extracted personal benefits, the effect of a disinterested stockholder approval of [a transaction] is review under the irrebutable business judgment rule."); *see also Morrison v. Berry*, 191 A.3d 268, 274 (Del. 2018) (summarizing extent of *Corwin*'s application).

[45] *Larkin*, 2016 WL 4485447, at *9 (citing *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014)).

[46] *MFW*, 88 A.3d at 644 (summarizing the requirement that a transaction be "conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders"); *Flood v. Syntura Int'l, Inc.*, 195 A.3d 754, 763 (Del. 2018) (holding that "the purpose of the words '*ab initio*' . . . require the controller to self-disable before the start of substantive economic negotiations"); *Olenik v. Lodzinski*, 208 A.3d 704,

not subject to the *MFW* protections, the business judgment standard does not apply at the pleadings stage if Plaintiff has adequately pleaded the existence of a conflicted controller or control group.

In this case, Plaintiff argues that BlackRock and HC Partners comprised such a control group.[47] To prevail at the pleadings stage, the Amended Complaint must contain facts sufficient to form a reasonably conceivable inference that BlackRock and HC Partners, if treated as a group, exercised control sufficient to give rise to fiduciary obligations under Delaware law. The Amended Complaint must further support a reasonably conceivable inference that BlackRock and HC Partners indeed formed a group.

It is reasonably conceivable that BlackRock and HC Partners, if treated as a group, wielded control sufficient to give rise to fiduciary duties. BlackRock and HC Partners controlled approximately 46.1% of PennyMac Inc.'s voting stock. They also each enjoyed the unilateral right under the LLC Agreement to block the Reorganization.[48] For these reasons, Kurland needed buy-in from these stockholders

---

716 (Del. 2019) (confirming "*ab initio*" means that controller-disabling mechanisms must be implemented before there has been "any economic horse trading").

[47] Plaintiff alternatively argues that BlackRock, HC Partners, and Kurland formed a control group, but Plaintiff does not plead significant facts particular to Kurland and instead refers to the "executive leadership team" generally. This decision thus rejects this alternative argument.

[48] LLC Agreement § 7.1(c) ("Notwithstanding any provision to the contrary contained in this Agreement, as long as BlackRock Member or [HC Partners] Member holds any Class A Units, the Company shall not . . . convert the legal form of the Company into a

21

and only these stockholders to secure approval of the Reorganization. BlackRock and HC Partners also each had the right to appoint two representatives to the Board for a total of four out of eleven. Taken together, these allegations give rise to a reasonable inference that BlackRock and HC Partners could exercise at least transaction-specific control in connection with the Reorganization if they worked together.[49]

This analysis thus turns on whether, at the pleading stage, BlackRock and HC Partners may be treated as a group. The Delaware Supreme Court recently addressed the requirements for pleading a control group in *Sheldon v. Pinto*, adopting the "legally significant connection" standard applied by multiple decisions of this Court:

> To demonstrate that a group of stockholders exercises control collectively, the [plaintiff] must establish that they are connected in some legally significant way—such as by

corporation, in each case, without the consent of BlackRock Member and Highfields Member . . . ."); *see also* HC P'rs Opening Br. at 6. Because Plaintiff does not argue that these blocking rights, standing alone, conveyed control to either BlackRock or HC Partners respectively, this decision does not address the issue.

[49] *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114–15 (Del. 1994) (affirming Court of Chancery's finding that stockholder owning 43.3% of equity with rights to nominate five of eleven directors could dictate terms in the board room and therefore "exercise[d] actual control over [the company] by dominating its corporate affairs"); *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4–5 (Del. Ch. June 5, 2006) (concluding at pleadings stage that it was reasonably conceivable that two stockholders, collectively owning 17.1% of the company's voting stock with the ability to nominate two of five directors and "veto" certain corporate decisions, effectively controlled the company); *see also In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 257 (Del. Ch. 2006) (noting that "plaintiffs need not demonstrate that [the alleged controller] oversaw the day-to-day operations of the company" and that "[a]llegations of control over the particular transaction at issue are enough").

contract, common ownership, agreement, or other arrangement—to work together toward a shared goal. To show a legally significant connection, the [plaintiff] must allege that there was more than a mere concurrence of self-interest among certain stockholders. Rather, there must be some indication of an actual agreement, although it need not be formal or written.[50]

Applying the "legally significant connection" test in *Sheldon*, the Supreme Court favorably discussed *In re Hansen Medical Shareholders Litigation*.[51] In *Hansen*, the Court found that the plaintiffs adequately alleged facts sufficient to infer the existence of a control group among stockholders who agreed to rollover their equity. The plaintiffs pleaded "more than a mere concurrence of self-interest" by identifying an array of plus factors that allowed the Court to infer "some indication of an actual agreement."[52] These factors included both historical ties and transaction-specific ties.

The historical ties alleged in *Hansen* included: the group members' twenty-one-year history of investing in the same entities; the group members' self-designation as a "group" in historical SEC filings unrelated to Hansen; the group members' exclusive right to participate in the private placement that made them

---

[50] *Sheldon v. Pinto*, – A.3d –, 2019 WL 4892348, at *4 (Del. Oct. 4, 2019) (collecting cases interpreting *Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697 (Del. Ch. May 22, 2009), and adopting that standard).

[51] 2018 WL 3025525 (Del. Ch. June 18, 2018).

[52] *Sheldon*, 2019 WL 4892348, at *4 (citing *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *15 (Del. Ch. Oct. 24, 2014)).

Hansen's largest stockholders; and the group members' designation by Hansen as "Principal Purchasers" in subsequent private placements, which gave the group members special rights concerning the private placements.[53]

The transaction-specific ties alleged in *Hansen* included: the acquiring company's identification of the group members as "Key Stockholders," which allowed the "'Key Stockholders,' but only the Key Stockholders, to negotiate directly with" the acquiring company";[54] the group members' contemporaneous execution of voting agreements that required the members to vote in favor of the transaction;[55] and the group members' execution of stock purchase agreements requiring that they rollover their stakes in the surviving entity.[56]

When weighing the alleged transaction-specific ties against the backdrop of the alleged historical connections between the stockholders, the Court in *Hansen* found it reasonably conceivable that the stockholders "functioned as a control group during the [transaction]."[57]

To meet the *Sheldon* standard in this case, Plaintiff follows the *Hansen* playbook. He alleges that the interests of BlackRock and HC Partners were aligned

---

[53] *Hansen*, 2018 WL 3025525, at *7.

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

24

in optimizing the exchange ratio to favor LLC Unitholders. As plus factors, Plaintiff points to historical and transaction-specific ties between BlackRock and HC Partners.

As historical ties, Plaintiff alleges that BlackRock and HC Partners share a ten-year history of co-investment in PennyMac with no gaps. They decided to start PennyMac together as the Company's founding sponsors.[58] From inception, the LLC Agreement has referred to BlackRock and HC Partners interchangeably and as "Sponsor Members."[59] Documents filed in connection with the Public REIT IPO one year after the founding of PennyMac refer to the two entities as "strategic investors."[60] The Up-C public offering documents filed four years later also continue to describe BlackRock and HC Partners as "strategic partners."[61] Plaintiff further alleges that subsequent public disclosures continued to use the same joint nomenclature with respect to BlackRock and HC Partners. Just as in *Hansen*, Plaintiff has alleged a multi-year history of co-investment between group members

---

[58] *See* Am. Compl. ¶ 39 ("BlackRock and Highfields Capital Management Launch New Company To Acquire and Restructure Distressed Mortgage Loans."); *id.* ("BlackRock . . . and Highfields Capital Management today announced that they have sponsored a new company [PennyMac]."); *id.* (referring to BlackRock and HC Partners as "strategic partners").

[59] *Id.* ¶ 55 (defining BlackRock and HC Partners as "Sponsor Members").

[60] *Id.* ¶ 53 (calling BlackRock and HC Partners "strategic investors").

[61] *Id.* ¶ 54.

that was identified and recognized by the Company as well as the group itself in public disclosures.

As transaction-specific ties, Plaintiff alleges that management met jointly with BlackRock and HC Partners to negotiate the Reorganization, granting them preferential review and exclusive weigh-in before the Board had considered the proposal. Specifically, after the Board requested a formal analysis of Kurland's proposal on February 27, 2018, but before management ever presented to the Board on May 30, 2018, management chose to meet twice with BlackRock and HC Partners together to discuss the Reorganization. During meetings, management's presentations depicted BlackRock and HC Partners as belonging to a collective unit. Management treated BlackRock and HC Partners as a collective unit whose opinion was more of a priority than the Board's. Management did not meet with BlackRock and HC Partners apart from one another. And management did not meet with any other LLC Unitholders. Plaintiff alleges that BlackRock and HC Partners ultimately secured a late-in-the-game revision in the form of an exclusive right exclusive to BlackRock and HC Partners requiring "the consent of both BlackRock and [HC Partners] . . . to terminate the Reorganization prior to the effective date."[62]

As in *Hansen*, BlackRock and HC Partners' voting power, concurrence of interests, historical ties, and transaction-specific coordination give rise to a

---

[62] *Id.* ¶ 87.

26

reasonably conceivable inference that the alleged group had more than a "mere concurrence of self-interest" and an "actual agreement" to work together in connection with the Reorganization.

In response, Defendants push back on one of the foundational premises of Plaintiff's argument—that the interests of BlackRock and HC Partners were in fact aligned in connection with the Reorganization. One key benefit of the Reorganization is the resulting preferential tax structure for persons and entities taxed at the individual rate. HC Partners is taxed at the individual rate. BlackRock is taxed at the corporate rate. Defendants argue it would be unreasonable to conclude that BlackRock agreed to work with HC Partners to push through a transaction from which it did not obtain critical tax benefits.

Defendants' argument does not persuade the Court at this stage that the group members' interests were so misaligned that it would be unreasonable to infer a legally significant connection regarding the Reorganization. At the pleadings stage, Plaintiff is entitled to have reasonable inferences drawn in his favor, and despite the distinguishable tax differences, BlackRock and HC Partners shared an interest in gaining a maximum percentage of the combined entity by optimizing the exchange ratio. This, coupled with the historical and transaction-specific ties alleged, is sufficient to support a reasonable inference of a group.

Defendants also argue there can be no reasonable inference of a control group because no written agreement executed by BlackRock and HC Partners provided them rights in connection with the Reorganization. For this point, Defendants rely on *van der Fluit*, where the plaintiff cited two agreements to bind members of a purported control group: an investor rights agreement signed by multiple early-stage investors, and voting rights agreements that required multiple stockholders to vote in favor of the transaction.[63] In dismissing the plaintiff's theory, the *van der Fluit* Court noted that these agreements were also signed by stockholders whom plaintiff did not allege to be part of the group, and that the investor rights agreement "contain[ed] no voting, decision-making, or other agreements that bear on the transaction challenged."[64]

In this case, Defendants are correct that the written agreements identified by Plaintiff, standing alone, suffer from some of the infirmities noted in *van der Fluit*. But the absence of such a "formal or written" agreement pertaining to the transaction is not fatal to the Plaintiff's theory.[65] Instead, those agreements can and do lend some support to a plaintiff-friendly pleading-stage inference that BlackRock and HC Partners actually agreed, in connection with the Reorganization, to work together.

---

[63] *van der Fluit*, 2017 WL 5953514, at *6.

[64] *Id.*

[65] *See Sheldon*, 2019 WL 4892348, at *4 ("Rather, there must be some indication of an actual agreement, *although it need not be formal or written*." (emphasis added)).

In the end, "[b]ecause the analysis for whether a control group exists is fact intensive, it is particularly difficult to ascertain at the motion to dismiss stage."[66] In this case, the sum-total of the facts alleged and inferences therefrom make it at least reasonably conceivable that BlackRock and HC Partners formed a control group that exercised effective control over PennyMac in connection with the Reorganization. For this reason, *Corwin* does not apply at the pleadings stage, and the Court evaluates the sufficiency of the Amended Complaint under the entire fairness standard.[67]

## B. Application of Entire Fairness

Even if entire fairness is the appropriate standard of review, Defendants argue Plaintiff has failed to allege facts sufficient to call into question the fairness of the Reorganization even at the pleadings stage. "The concept of fairness has two basic aspects: fair dealing and fair price."[68] Although the two aspects may be examined separately, "the test for fairness is not a bifurcated one as between fair dealing and

---

[66] *Hansen*, 2018 WL 3025525, at *6.

[67] Plaintiff also argues that *Corwin* does not apply because the stockholder vote was uninformed due to two material omissions from the Proxy and further argues that *Corwin* should not apply where a majority of the Board is conflicted with respect to the underlying transaction. Pl.'s Answering Br. at 46–56; 44–45. The latter argument is clearly inconsistent with well-reasoned decisions of this Court. *Larkin*, 2016 WL 4485447, at *10 (concluding that "the only transactions that are subject to entire fairness that cannot be cleansed by proper stockholder approval are those involving a controlling stockholder"); *Merge Healthcare*, 2017 WL 395981, at *6 (adopting *Larkin*). The former argument presents a close call, which the Court need not undertake at this stage. Because Plaintiff's control group allegations suffice to avoid *Corwin*'s application at the pleading stage, this decision does not address Plaintiff's alternative arguments.

[68] *Weinberger v. UOP, Inc.*, 547 A.2d 701, 711 (Del. 1983).

price.  All aspects of the issue must be examined as a whole since the question is one of entire fairness."[69]  At the pleadings stage, "[t]he possibility that the entire fairness standard of review may apply tends to preclude the Court from granting a motion to dismiss under Rule 12(b)(6)."[70]

Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[71]  When a there is a special committee involved, "[p]articular consideration must be given to evidence of whether the special committee was truly independent, fully informed and had the freedom to negotiate at arm's length."[72]

Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[73]

---

[69] *Id.*

[70] *Klein v. H.I.G. Capital, L.L.C.*, 2018 WL 6719717, at *16 (Del. Ch. Dec. 19, 2018); *see also Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *15 (Del. Ch. July 26, 2018) (noting entire fairness review "typically precludes dismissal of a complaint under Rule 12(b)(6)").

[71] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (citing *Weinberger*, 547 A.2d at 711).

[72] *Lynch*, 638 A.2d at 1120–21.

[73] *Id.* at 1115.

The Court has already found a reasonable inference that BlackRock and HC Partners exercised control over the formulation of the Reorganization before it was ever presented to the Board, let alone the Special Committee. Moreover, "the Special Committee's authority [was] limited to making a recommendation to the Board of Directors, rather than giving final approval or implementing such action or transaction."[74] These facts at least call into question whether the Special Committee was fully empowered to negotiate at arm's length, which suffices to meet the burden of pleading an unfair process in this context.

The fair dealing and fair price inquiries interact.[75] Just as a "strong record of fair dealing can influence the fair price inquiry, . . . process can infect price."[76] It is reasonably conceivable that the alleged defects in the negotiation process "infected" the Reorganization's exchange ratio. Thus, Plaintiff has adequately pleaded an inference of unfair price.

## III. CONCLUSION

Defendants' motions to dismiss are DENIED on the grounds that Plaintiff has alleged sufficient facts from which this Court can infer that BlackRock and HC Partners constituted a control group, rendering entire fairness the proper standard of

---

[74] Am. Compl. ¶ 75.

[75] *In re Dole Foods Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *34 (Del. Ch. Aug. 27, 2015).

[76] *Reis v. Hazlett Strip-Casting Corp.*, 28 A.3d 442, 467 (Del. Ch. 2011).

review.  Plaintiff has also pled sufficient facts to call into question the entire fairness

of the Reorganization.